**2016-1103**
**(Opposition No. 91211612)**

# In The
# United States Court of Appeals
# For The Federal Circuit

**Oakville Hills Cellar, Inc.,**
**dba Dalla Valle Vineyards,**
*Appellant,*

v.

**Georgallis Holdings, LLC,**
*Appellee.*

**APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK**
**OFFICE, TRADEMARK TRIAL AND APPEAL BOARD**

## BRIEF OF APPELLANT

J. Scott Gerien
Dickenson, Peatman & Fogarty
1455 First Street, Suite 301
Napa, California 94559
(707) 252-7122
(707) 255-6876
sgerien@dpf-law.com

*Counsel for Appellant*

FORM 9. Certificate of Interest

Form 9

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Oakville Hills Cellar, Inc.          v.     Georgallis Holdings, LLC

Case No.    16-1103

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Oakville Hills Cellar, Inc.          certifies the following (use "None" if applicable; use extra sheets
if necessary):

1.     The full name of every party or amicus represented by me is:

Oakville Hills Cellar, Inc., dba Dalle Valle Vineyards

2.     The name of the real party in interest (Please only include any real party in interest
NOT identified in Question 3. below) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent of the
stock of the party or amicus curiae represented by me are listed below. (Please list each party
or amicus curiae represented with the parent or publicly held company that owns 10 percent
or more so they are distinguished separately.)

None.

4.  ☐   The names of all law firms and the partners or associates that appeared for the party
or amicus now represented by me in the trial court or agency or are expected to appear
in this court (and who have not or will not enter an appearance in this case) are:

None.

November 2, 2015
Date

Signature of counsel

Please Note: All questions must be answered

J. Scott Gerien

cc:

Printed name of counsel

Reset Fields

# **TABLE OF CONTENTS**

I. STATEMENT OF RELATED CASES ................................................................ 1

II. STATEMENT OF JURISDICTION ................................................................ 1

III. STATEMENT OF THE ISSUES ................................................................... 1

IV. STATEMENT OF THE CASE....................................................................... 2

  A. STATEMENT OF FACTS............................................................................ 2

  B. THE BOARD'S DECISION .......................................................................... 5

V. SUMMARY OF ARGUMENT........................................................................ 8

VI. ARGUMENT ................................................................................................. 9

  A. STANDARD OF REVIEW ........................................................................... 9

  B. STANDARD FOR DETERMINING SIMILARITY OF MARKS ............... 10

    1. Similarity As To Visual Appearance ........................................................ 11

      a. The Board Failed To Compare The Marks In Their Entireties........... 11

      b. "MAYA" Dominates The Appearance Of Both Marks....................... 13

      c. Standard Characters Increase Similarity ............................................. 16

    2. Similarities In Sound................................................................................. 18

    3. Similarities In Meaning............................................................................. 21

      a. The Board's Conclusion That MAYARI Lacks Meaning Is
        Unsupported...................................................................................... 21

      b. The Board's Reliance On Dissimilarity Of Meaning Is Improper ..... 21

    4. Similarities In Commercial Impression ..................................................... 23

      a. Conditions For Purchase Are Ripe For Confusion .............................. 24

    5. Opposer Is Entitled To The Benefit of the Doubt....................................... 25

  C. POLICY UNDERLYING THE BOARD'S DECISION ................................ 26

i

1. The Board's Decision Diminishes Trademark Rights And Value .............. 26

V. CONCLUSION ................................................................................................. 26

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Cases

*Canadian Imperial Bank of Commerce v. Wells Fargo Bank*, *N.A.,* 811 F.2d 1490

(Fed. Cir. 1987) ................................................................................................... 14

*Cecile Gagnon Company v. Bourjois, Inc*., 223 F.2d 731 (CCPA 1955) ............... 26

*Century 21 Real Estate v. Century Life of Am*., 970 F.2d 874 (Fed. Cir.1992) ...... 10

*Coach Services, Inc. v. Triumph Learning LLC*, 668 F. 3d 1356 (Fed. Cir. 2012) ....

.................................................................................................................. 10, 11

*Coca-Cola Bottling Co. of Memphis, Tennessee, Inc. v. Joseph E. Seagram and*

*Sons, Inc*., 526 F.2d 556 (CCPA 1975) ................................................................ 14

*Consol. Edison v. NLRB*, 305 U.S. 197 (1938) .......................................................... 9

*Cunningham v. Laser Golf Corp*., 222 F.3d 943 (Fed. Cir. 2000) .......................... 16

*Duca di Salaparuta S.p.A v. Corvus Cellars LLC*, Opposition No. 91191848 (June

26, 2012) ............................................................................................................... 24

*Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538 (1920) ... 11

*Firestone Tire & Rubber Co. v. Montgomery Ward & Co., Inc*., 150 F.2d

439 (CCPA 1945) ................................................................................................. 26

*Gabriel Meffre v. Maria y Adelina S.A.*, Opposition No. 91164878 (June 1, 2007)

............................................................................................................................... 24

*Glenwood Laboratories v. American Home Products Corp.*, 455 F.2d 1384 (CCPA

1972) ..................................................................................................................... 12

*Guinness United Distillers & Vintners B.V. v. Anheuser-Bush, Inc*., 64 USPQ2d

1039 (SDNY 2002) ........................................................................................ 18, 24

*H. Sichel Sohne, GmbH v. John Gross & Co*., 204 USPQ 257 (TTAB 1979) ....... 25

*Henry I. Siegel Co. v. M&R International Mfg. Co, Inc.*, 4 USPQ2d 1154 (TTAB 1987)................................................................................................................... 14

*Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261 (Fed. Cir. 2002) ...... 10

*Humble Oil & Refining Company v. Allied Chemical Corporation*, 165 USPQ 280 (TTAB 1970)................................................................................................. 27

*In re BASF A.G.*, 189 USPQ 424 (TTAB 1975) ...................................................... 15

*In re Bayer Aktiengesellschaft*, 488 F.3d 960 (Fed. Cir. 2007) ............................... 10

*In re Belgrade Shoe Co.*, 411 F.2d 1352 (CCPA 1969)........................................... 19

*In re Chesebrough-Pond's Inc.*, 161 USPQ 310 (TTAB 1969).............................. 27

*In re Cresco Mfg. Co.*, 138 USPQ 401 (TTAB 1963) ............................................. 20

*In re Curtice-Burns, Inc.*, 231 USPQ 990 (TTAB 1986).......................................... 14

*In re Data Packaging Corp.*, 453 F.2d 1300 (CCPA 1972) .................................... 16

*In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973) ..................... 10

*In re Energy Telecommunications & Electrical Association*, 222 USPQ 350 (TTAB 1983)................................................................................................... 20

*In re Gartside*, 203 F.3d 1305 (2000) ........................................................................ 9

*In re Great Lakes Canning, Inc.*, 227 USPQ 483 (TTAB 1985)............................ 19

*In re Lamson Oil Co.*, 6 USPQ2d 1041 (TTAB 1987) ............................................ 14

*In re Mack*, 197 USPQ 755 (TTAB 1977)................................................................. 26

*In re Nat'l Data Corp.*, 753 F.2d 1056 (Fed. Cir. 1985) ......................................... 13

*In re Oil Well Company*, 181 USPQ 656 (TTAB 1973)........................................... 26

*In re Pacer Tech.*, 338 F.3d 1348 (Fed. Cir. 2003)..................................................... 9

*In re Pellerin Milnor Corp.*, 221 USPQ 558 (TTAB 1983).............................. 14, 15

*In re Pix of America, Inc.*, 225 USPQ 691 (TTAB 1985)........................................ 14

*In re Viterra Inc.*, 671 F.3d 1358 (Fed. Cir. 2012) ...................................... 10, 19, 25

*In re White Rock Distilleries, Inc.*, 92 USPQ2d 1282 (TTAB 2009) ..................... 16

*Jiffy Inc. v. Jordan Industries, Inc.*, 481 F.2d 1323 (CCPA 1973) ......................... 25

iv

*Kabushiki Kaisha Hattori Tokeiten v. Scuotto*, 228 USPQ 461 (TTAB 1985) ...... 19

*Key Chemicals, Inc. v. Kelite Chemicals Corp.*, 464 F.2d 1040 (CCPA 1972)...... 25

*Kimberly-Clark Corp. v. H. Douglas Enters.*, 774 F.2d 1144 (Fed. Cir. 1985) ..... 11

*Krim-Ko Corp. v. Coca-Cola Co.*, 390 F.2d 728 (CCPA 1968)............................. 26

*La Maur, Inc. v. Matney*, 167 USPQ 559 (TTAB 1970) ........................................ 14

*Leading Jewelers Guild, Inc. v. LJOW Holdings, LLC*, 82 USPQ2d 1901 ............ 13

*Magnavox Co. V. Multivox Corp. of Am.*, 341 F.2d 139 (CCPA 1965) ................. 11

*Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399

(CCPA 1974)...................................................................................................... 12

*Masterpiece of Pennsylvania Inc., v. Consolidated Novelty Co.,* 368 F.Supp. 550

(SDNY 1973) ..................................................................................................... 26

*Oakville Hills Cellar, Inc. v. Victor F. Maya*, 2008 TTAB LEXIS 570, Opposition

No. 91163751 (TTAB 2008)............................................................................... 22

*On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080 (Fed. Cir. 2000)........... 9

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396

F.3d 1369 (Fed. Cir. 2005)................................................................................. 13

*Phillips Petroleum Co. v. C. J. Webb, Inc.*, 442 F.2d 1376 (CCPA 1971)............. 16

*Presto Products, Inc. v. Nice-Pak Products, Inc.,* 9 USPQ2d 1895 (TTAB 1998).13

*Recot, Inc. v. Becton*, 214 F.3d 1322 (Fed. Cir. 2000).............................................. 9

*San Fernando Elec. Mfg. Co. v. JFD Elec. Components Corp.*, 565 F.2d 683

(CCPA 1977)...................................................................................................... 11

*San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683

(CCPA 1977)...................................................................................................... 25

*Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 33 (1900) ............................. 10

*See San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683

(CCPA 1977)...................................................................................................... 12

*Squirtco v. Tomy Corp.*, 697 F.2d 1038 (Fed. Cir. 1983) ....................................... 17

*Stoncor Group, Inc. v. Specialty Coatings, Inc*., 759 F.3d 1327 (Fed. Cir. 2014).. 19

*Sun Electric Corp. v. Sun Oil Company of Pennsylvania*, 196 USPQ 450 (TTAB

1977).................................................................................................................. 15

*TBC Corp. v. Holsa, Inc*., 126 F.3d 1470 (Fed. Cir. 1997)..................................... 22

*United States Olympic Comm. v. Olymp-Herrenwaschefabriken Bezner GmbH &*

*Co*., 224 USPQ 497 (TTAB 1984)...................................................................... 15

*Weiss Associates Inc. v. HRL Associates, Inc*., 902 F.2d 1546 (Fed. Cir. 1990).... 14

*Wella Corp, v. California Concept Corp*., 558 F.2d 1019 (CCPA 1977)............... 14

*Winnebago Industries, Inc. v. Oliver & Winston, Inc*., 207 USPQ 335 (TTAB

1980).................................................................................................................. 11

*Winn's Stores, Incorporated v. Hi-Lo, Inc*., 203 USPQ 140 (TTAB 1979)............ 25

## Statutes

15 U.S.C. § 1067 ................................................................................................. 1

15 U.S.C. § 1071(a)(1) ......................................................................................... 1

15 U.S.C. § 1071(a)(2) ......................................................................................... 1

28 U.S.C. § 1295(a)(4)(B)..................................................................................... 1

37 C.F.R. § 2.145(d)(1) ......................................................................................... 1

37 C.F.R. § 2.52(a) ............................................................................................. 16

5 U.S.C. § 706(2)(e) ............................................................................................. 9

## Rules

Trademark Manual of Examining Procedure ("TMEP") § 1207.01(c)(iii) ............ 16

## I. STATEMENT OF RELATED CASES

Counsel for Oakville Hills Cellar, Inc. ("Opposer" or "Oakville") is unaware of any related cases as defined by Federal Circuit Rule 47.5.

## II. STATEMENT OF JURISDICTION

This appeal concerns Opposition Proceeding No. 91211612, decided by the Trademark Trial and Appeal Board (the "Board" or "TTAB"), which had jurisdiction over the opposition proceeding under Section 17 of the Lanham Act, 15 U.S.C. § 1067. This Court has jurisdiction over the appeal of the Board's ruling in the opposition proceeding which was a final order that disposed of all parties' claims, under Section 21(a)(1) of the Lanham Act, 15 U.S.C. § 1071(a)(1), and 28 U.S.C. § 1295(a)(4)(B). The Board's decision was issued on July 16, 2015, and Opposer's Notice of Appeal was timely filed on September 14, 2015 under Section 21(a)(2) of the Lanham Act, 15 U.S.C. § 1071(a)(2), and 37 C.F.R. § 2.145(d)(1).

## III. STATEMENT OF THE ISSUES

1. Whether the Board's findings in its analysis of the similarity of the marks as to visual appearance, sound, meaning and commercial impression are supported by substantial evidence; and

2. Whether confusion is likely between the mark shown in Applicant's Application Serial No. 85/735,694 for the mark MAYARI and Oakville's Reg. No. 2,508,401 for the mark MAYA, both for wine in International Class 33, thus warranting reversal of the Board's decision, and a refusal to grant registration to Applicant's MAYARI mark.

1

## IV. STATEMENT OF THE CASE

Oakville seeks reversal of the Trademark Trial and Appeal Board's July 16, 2015 decision dismissing Opposition Proceeding No. 91211612 to Application Serial No. 85/735,694 for the mark MAYARI filed by Appellee/Applicant, Georgallis Holdings, LLC ("Applicant").  Oakville alleged that Applicant's mark was likely to cause confusion with the mark shown in Reg. No. 2,508,401 for the mark MAYA for the identical goods, wine.  Each factor of the *du Pont* analysis was either neutral or favored Oakville, except the similarity of the marks. Despite conceded similarities between the marks in appearance and despite record evidence of similarity as to sound, meaning and commercial impression, the Board found insufficient similarity, and no likelihood of confusion.

The Board's dismissal of the opposition was in error because the Board failed to consider record evidence of significant similarities between the marks (e.g., the marks are largely identical, unrestricted as to form, and both derive from the female name Maya), while engaging in speculation about consumer perception and making unwarranted evidentiary inferences in order to find a lack of sufficient similarity, without substantial evidentiary support (indeed, in the face of substantial evidence to the contrary). From a policy perspective, the Board's decision works to artificially circumscribe the rights of all trademark owners and potentially diminishes the overall value attendant to obtaining U.S. federal trademark registration and of trademark ownership generally, and promotes marketplace confusion.

### A. STATEMENT OF FACTS

On September 21, 2012, Applicant filed application Ser. No. 85/735,694 for the word mark MAYARI for wine in International class 33 in standard character

form (A024-A027). The application was approved for publication with no citation to any registration or application owned by Oakville or any other entity.

On July 7, 2013, Oakville filed its opposition (A029-A034) on the basis of a likelihood of confusion with Reg. No. 2,508,401 for the mark MAYA for wine in International class 33 in typed drawing form (equivalent of standard characters), which issued to Oakville on November 20, 2001 (A028). The notice of opposition was based on rights in the foregoing registered mark, as well as common law rights in the mark MAYA beginning at least as early as September 1991. On July 23, 2013, Applicant filed its Answer denying any likelihood of confusion (A035-A038).

During the proceeding, Oakville submitted evidence from numerous independent online references, including evidence from a single source showing that both MAYA and MAYARI are known female given names having a common historical meaning as being the names of goddesses. 9 TTABVUE, Opposer's Notice of Reliance pp. 2-4, Exh. 2, p. 12-17, Exh. 3, p. 19, Exh. 4, p. 22, Exh. 5, p. 25-26, Exh. 6, p. 29, Exh. 7, p. 31-32, Exh. 8, p. 37 (A040-A069). Applicant did not object to this evidence.

Applicant submitted evidence from website searches of the Social Security Administration database of U.S. Social Security card applications after 1879 (further limited to a subset of those applicants who provided birthplace data) showing that MAYA had an entry, but MAYARI did not. 10 TTABVUE, Applicant's Notice of Reliance No. 1, Exh. 1-2, pp. 6, 8 (A070-A073). No additional information was provided regarding the nature or probative value of this evidence. Applicant also submitted online dictionary searches for MAYA and MAYARI (11 TTABVUE, Applicant's Notice of Reliance No. 3, Exh. 1-6, pp. 5-8, 10, 11, 13-15, 17, 20, 23) (A075-A094), but limited its search of at least one of the dictionary sources so as not to include two (2) linked encyclopedia definitions

for the term MAYARI. *See* 11 TTABVUE, Applicant's Notice of Reliance No. 3, Exh. 6 at p. 23 (A093-A094) (which reads "Mayari Found in: Encyclopedia, Wikipedia" (hyperlinks in original). Applicant (omitted and/or) submitted no additional third party or dictionary evidence of the definition of the term MAYARI, its meaning, or how the term is pronounced.

Applicant also submitted in the record Oakville's written responses to discovery requests, including Opposer's Responses to Applicant's First Set of Interrogatories, which show that "Maya" is the first name of Maya Dalla Valle who is the daughter of the founders of Appellant, and for whom the MAYA brand wine was named, and that the commercial impressions created by the MAYA mark include that of a "female forename" and "the name of a goddess" (15 TTABVUE, Applicant's Notice of Reliance No. 9, Opposer's Responses to Applicant's Interrogatories Nos. 23 and 24, pp. 14-15 (A099-A100)). Likewise, Applicant submitted in evidence Oakville's responses to Applicant's First Set of Requests for Admissions, which denied without qualification the request that Oakville "Admit that Oakville's MAYA trademark registration number 2508401 does not sound like Applicant's MAYARI mark." (16 TTABVUE, Applicant's Notice of Reliance No. 10, Exh. 1, Opposer's Response to Request for Admissions No. 3, pp. 6-7 (A101-A102)). Applicant presented no contrary evidence to refute this.

Finally and significantly, the record clearly shows that the parties' marks both derive from the female name MAYA. Applicant submitted on the record via Notice of Reliance an excerpt from its website which states that "With Mayari we honor our daughters Arianna and **Maya**." (17 TTABVUE, Applicant's Notice of Reliance No. 11, Exh. 2, p. 11 (A103).) (Emphasis added.) The Board did not address this fact in its finding that the marks would be perceived to have different meanings.

4

Applicant did not otherwise refute any evidence of record of the common meanings of MAYA and MAYARI. Apart from reference to the name "Maya," the parties submitted no other evidence of how the resulting MAYARI compound mark would be pronounced.

## B. THE BOARD'S DECISION

Although it found each of the other *du Pont* factors to be either neutral or favoring a likelihood of confusion, the Board ultimately held that there is no likelihood of confusion, resting its decision on the analysis regarding similarity of the marks at issue.

In analyzing the similarity of the marks, the Board said:

> [I]n the present case we see no reason to perceive any separation, visual or otherwise, between the MAYA– and –RI portions of Applicant's mark. The letters RI, alone, have no relevant consumer meaning, providing no reason for a customer to view the mark logically as MAYA *plus* RI, rather than as a single, unitary expression.

Decision p. 8 (A008).

The Board then supplied its own interpretation to Oakville's argument that the bottle incorporating Applicant's MAYARI mark will "inevitably appear to read 'MAYA' at certain orientations relative to an observer" (34 TTABVUE 16, Opposer's Brief p. 11 (A236)) by stating that Oakville is:

> suggesting that the vagaries of product placement *on a shelf* may conspire to obscure a part of Applicant's mark from the customer. While this is a type of 'mistake' encompassed within the statutory language of Section 2(d), the likelihood of such a mistake remains a

5

matter of speculation, absent evidence regarding the occurrence or regularity of mistakes of that sort.

Decision p. 8-9 (A008-A009)) (Emphasis added). (However, Oakville was not attempting to suggest mistake by way of bottle placement on a shelf.)

In its analysis regarding similarities in sound, the Board, without any evidence whatsoever (and against the weight of contrary evidence by both parties), "also considered the possibility that the first syllable [of MAYA] may be pronounced to rhyme with "hay" or "weigh." (*Id.* at p. 9 (A009).) Then immediately goes on:

> [t]here is nothing in the record to indicate how MAYARI would be pronounced. To the extent that both marks include the letters MAYA, they could be pronounced the same; however, we consider the possibility that MAYARI might be pronounced with the emphasis on its second or third syllables, and that the –YAR– syllable might be salient

*Id.*, thus presupposing alternative pronunciations where none were supplied, and arbitrarily dividing the word MAYARI, without substantial evidentiary support. The Board thus seemed to ignore Applicant's Notice of Reliance No. 11 (17 TTABVUE at p. 11 (A103)), which indicates that the mark MAYARI derives from the name MAYA, and would therefore presumably be pronounced likewise.

With respect to meaning, the Board incorrectly states, "Applicant's dictionary definitions indicate that MAYARI has **no** meaning," Decision at p. 10 (emphasis added), but this was not the case, because although Applicant's online searches apparently did not reveal any definition for MAYARI, this does not mean that the lack of a definition can establish the lack of a meaning. Furthermore, this evidence actually shows that there in fact *were* definitions for MAYARI, linked to "Encyclopedia" and "Wikipedia" entries which were withheld from evidence by

6

Applicant. 11 TTABVUE, Applicant's Notice of Reliance No. 3, Exhibit 6 at p. 23 (A093) (which reads "Mayari Found in: Encyclopedia, Wikipedia" (hyperlinks in original).)

Moreover, additional evidence supplied by Applicant, which the Board ignored, showed that the meaning of Applicant's MAYARI mark was, in fact a compound of two names, one of which is "Maya." *See* 17 TTABVUE, Applicant's Notice of Reliance No. 11, Exh. 2, p. 11 (A103). The Board dismissed Oakville's evidence and argument regarding the connection of the parties' marks to female deities and mythological references as "tenuous" before adopting Applicant's argument regarding the purported "popularity" of the parties' marks on the Social Security Administration's websites in order to reach the unfounded conclusion that consumers will not recognize the name MAYARI. *See* Decision, pp. 10-12 (A010-A012).

The Board concludes its analysis of similarities in the marks by stating that:

> the marks are visually similar only in part; no evidence shows that they would be pronounced alike, and they may well be pronounced quite differently. With respect to meaning, we are not persuaded that customers would be aware of the more esoteric meanings of the marks; rather, we find that most customers would likely perceive MAYA as a female personal name or the name of the pre-Columbian civilization, while most customers would perceive MAYARI as a coinage without meaning. In this regard, customers would likely find the term MAYA to be somewhat familiar, while finding MAYARI unfamiliar.

*Id.* at pp. 11-12. (A011-A012)

7

And the Board summarily concludes therefore "Overall we find that the marks create significantly different commercial impressions. Accordingly, the *du Pont* factor of the similarity or dissimilarity of the marks weighs against a finding of likelihood of confusion." *Id*. at p. 12. (A012)

> At the conclusion of the decision, the Board states that although:
>
> [t]he parties' goods are identical and would travel through the same channels to the same classes of customers, some of whom would exercise no more than an ordinary degree of care in selecting the goods.… …the marks are visually similar only in part; are only possibly similar, in part, in their pronunciation; and would likely be perceived to have different meanings and overall commercial impressions.  On this record, we find that the marks are sufficiently different that, under normal commercial conditions for the sale of wines, confusion is not likely.

*Id*. at p. 17. (A017)

Thus, the Board dismissed the opposition.

## V.  SUMMARY OF ARGUMENT

The Board's decision should be reversed in its entirety because it is not supported by substantial evidence and is contrary to law.  The Board's principal errors consisted of ignoring the record evidence of similarities in sight, sound and meaning and making unwarranted assumptions – not supported by any evidence, much less substantial evidence – regarding potential alternative pronunciations and the perceived meaning of Applicant's mark MAYARI.  Against the weight of contrary legal authority, the Board failed to properly consider the visual identity between the parties' marks, their identical origins, consequent pronunciation and meaning, the conditions under which the identical goods under the marks are

8

purchased, and the resulting overall commercial impression shared by the parties' marks.

The decision, if allowed to stand, signals a policy of diminution of trademark rights for all brand owners as against nearly identical later marks for identical goods (i.e., later comers simply need to append a short, unrecognized suffix to an arbitrary, registered mark in order to obviate a likelihood of confusion, irrespective of the mark's form), decreases the protection and value attendant to obtaining federal registration of a mark, and ultimately promotes consumer confusion.

## VI. ARGUMENT

### A. STANDARD OF REVIEW

This Court reviews the Board's factual determinations under the "substantial evidence" standard set out in the Administrative Procedure Act. The court must set aside the Board's factual determinations if they are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(e). "Considered to be less deferential than the [former] 'arbitrary, capricious' standard, [*see In re Gartside*, 203 F.3d at 1312, 53 USPQ2d at 1773,] 'substantial evidence' necessitates a stricter judicial review of agency factfinding." *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000); *see also Recot, Inc. v. Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000).

Substantial evidence is "'more than a mere scintilla' and [is] 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003) (*quoting Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)). Accordingly:

> [w]here two different conclusions may be warranted based on the evidence of record, the Board's decision to favor one conclusion over

the other is the type of decision that must be sustained by this court as
supported by substantial evidence.

*In re Bayer Aktiengesellschaft*, 488 F.3d 960, 970 (Fed. Cir. 2007).

This Court reviews questions of law *de novo* and without deference.
*Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002).
Although the Board's findings as to the individual elements of the *du Pont*
likelihood of confusion test (*In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357
(CCPA 1973)), are considered factual findings and thus reviewed under the
"substantial evidence" rule, the overall weighing of the individual elements of the
*du Pont* test is considered a question of law and is thus reviewed *de novo*, *Coach
Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1371 (Fed. Cir. 2012), as
is the ultimate issue of likelihood of confusion, *In re Viterra Inc.*, 671 F.3d 1358,
1361 (Fed. Cir. 2012).

## B.  STANDARD FOR DETERMINING SIMILARITY OF MARKS

When the goods are identical, as in this case, the appearance of a mark of
similar sound, appearance, or connotation is more likely to cause confusion than if
the goods are significantly different. *See Century 21 Real Estate v. Century Life of
Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992) ("When marks would appear on virtually
identical goods or services, the degree of similarity necessary to support a
conclusion of likely confusion declines."). Exact identity is not necessary to
generate confusion as to source of similarly-marked products. *See Saxlehner v.
Eisner & Mendelson Co.*, 179 U.S. 19, 33 (1900) ("It is not necessary to constitute
an infringement that every word of a trademark would be appropriated.")

There is a heavy burden on the newcomer to avoid consumer confusion as to
products and their source. Precedent illustrates many examples in which

10

registration was denied to the second entrant, in view of a mark in prior use, *e.g., Kimberly-Clark Corp. v. H. Douglas Enters.*, 774 F.2d 1144 (Fed. Cir. 1985) (HUGGIES and DOUGIES); *Magnavox Co. V. Multivox Corp. of Am.*, 341 F.2d 139, 141 (CCPA 1965) (MAGNAVOX and MULTIVOX).

The Board correctly began its analysis by indicating that "the proper test is not a side-by-side comparison of the marks," but "whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Services, Inc.*, 668 F. 3d at 1368. The marks must be considered "in light of the fallibility of memory…." *San Fernando Elec. Mfg. Co. v. JFD Elec. Components Corp.*, 565 F.2d 683 (CCPA 1977). The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *Winnebago Industries, Inc. v. Oliver & Winston, Inc.*, 207 USPQ 335, 344 (TTAB 1980).

However, in conducting its analysis the Board appears to have disregarded the above standards in finding that the junior MAYARI mark for wine was so dissimilar to the senior MAYA mark for wine that consumers would not be confused, despite their fallible memories.

### 1. Similarity As To Visual Appearance

#### a. The Board Failed To Compare The Marks In Their Entireties

The U.S. Supreme Court has said, "The commercial impression of a trademark is derived from it as a whole, not from the elements separated and considered in detail. For this reason, it should be considered in its entirety . . . ." *Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545-46 (1920). The basic principle in determining confusion between marks is that marks

must be compared in their entireties and must be considered in connection with the particular goods or services for which they are used. *Glenwood Laboratories v. American Home Products Corp.*, 455 F.2d 1384, 1385 (CCPA 1972). It follows from that principle that likelihood of confusion cannot be predicated on dissection of a mark, that is, by focusing on only part of a mark.

The Board's analysis of visual similarity based on the meaning and/or separability of the suffix –RI (or purported lack thereof) is entirely misplaced as an exercise in dissecting the applied-for mark MAYARI in order to find a lack of similarity as to appearance with MAYA, rather than considering the parties' marks in their entireties. Moreover, the Board's statements that (1) the suffix –RI lacks meaning and (2) that there is no reason for a customer to view the mark logically as MAYA plus RI, are both entirely without evidentiary support.

While it is true that each syllable of each mark generates an "impact," the only impact to be properly considered is that of the whole. *Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399 (CCPA 1974). *See San Fernando Elec. Mfg. Co.*, 565 F.2d at 685 (MONOCERAM and MICROCERAM not sufficiently different in their total impacts to eliminate likelihood of confusion as to source). The Board's summary conclusion, that lack of meaning or separability of the –RI component of MAYARI overrides or prevents consumer perception of the commonly recognized, dominant MAYA stem in both marks is not substantially supported by facts, goes against the weight of the law cited by the Board, and sets the ensuing *du Pont* analysis on unsound footing. As discussed above, the appropriate focus of inquiry is the general impression of the marks MAYA and MAYARI in all permissible forms, as applied to identical goods, such that consumers would be likely to assume a connection between the parties.

12

### b. "MAYA" Dominates The Appearance Of Both Marks

The Board's decision recognizes that in many circumstances, one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark. *See, e.g.*, *Leading Jewelers Guild, Inc. v. LJOW Holdings, LLC*, 82 USPQ2d 1901, 1905. This Court has said that:

> [i]n articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable.

*In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985).

The Board's decision concedes that the marks MAYA and MAYARI resemble each other in appearance in that ***they share the initial four letters MAYA***, which constitute the entirety of Oakville's registered mark, and that the first part of a mark is most important in evaluating similarity. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 1372-1973 (Fed. Cir. 2005)*. See also Presto Products, Inc. v. Nice-Pak Products, Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1998) ("It is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered."). *See* Decision, p. 8 (A008).

However, in its analysis of visual similarity in this case, the Board gave greater weight to the suffix of Applicant's mark, stating (without evidentiary support) that "[t]he letters RI, alone, have no relevant meaning, providing no reason for a customer to view the mark logically as MAYA *plus* RI, rather than as a single unitary expression." Decision, p. 8 (A008 ). This is completely contrary to

13

the recognized standard of a consumer's imperfect recollection and the first portion of the mark being dominant, especially within the context of identical goods.

Furthermore, there is no dispute that Applicant's mark encompasses the entirety of the registered mark. Likelihood of confusion due to similarity has frequently been found where the entirety of one mark is encompassed within the other. *See Wella Corp, v. California Concept Corp*., 558 F.2d 1019 (CCPA 1977) (CALIFORNIA CONCEPT similar to CONCEPT); *Coca-Cola Bottling Co. of Memphis, Tennessee, Inc. v. Joseph E. Seagram and Sons, Inc*., 526 F.2d 556 (CCPA 1975) (BENGAL LANCER similar to BENGAL); *Henry I. Siegel Co. v. M&R International Mfg. Co, Inc.*, 4 USPQ2d 1154 (TTAB 1987) (CHIC confusingly similar to LA CHIC when both for women's clothing; customers seeing the junior user's mark could mistakenly think that it designated a particular line of clothing made by the senior user); *La Maur, Inc. v. Matney*, 167 USPQ 559 (TTAB 1970) (applicant's ITALIAN STYLE mark similar to registered STYLE mark).

It is also well established that two marks may be confusingly similar in appearance despite the addition, deletion or substitution of letters or words. *See, e.g*., *Weiss Associates Inc. v. HRL Associates, Inc*., 902 F.2d 1546 (Fed. Cir. 1990) (TMM held confusingly similar to TMS, both for systems software); *Canadian Imperial Bank of Commerce v. Wells Fargo Bank, N.A.,* 811 F.2d 1490 (Fed. Cir. 1987) (COMMCASH held likely to be confused with COMMUNICASH, both for banking services); *In re Lamson Oil Co*., 6 USPQ2d 1041 (TTAB 1987) (TRUCOOL for synthetic coolant held likely to be confused with TURCOOL for cutting oil); *In re Curtice-Burns, Inc*., 231 USPQ 990 (TTAB 1986) (MCKENZIE'S (stylized) for processed frozen fruits and vegetables held likely to be confused with McKENZIE for canned fruits and vegetables); *In re Pix of America, Inc*., 225 USPQ 691 (TTAB 1985) (NEWPORTS for women's shoes held

likely to be confused with NEWPORT for outer shirts); *In re Pellerin Milnor Corp.*, 221 USPQ 558 (TTAB 1983) (MILTRON for microprocessor used in commercial laundry machines held likely to be confused with MILLTRONICS (stylized) for electronic control devices for machinery); *In re BASF A.G.*, 189 USPQ 424 (TTAB 1975) (LUTEXAL for resinous chemicals used in dyeing textiles held likely to be confused with LUTEX for non-resinous chemicals used in the textile industry).

In the matter on appeal, the essential sight/sound difference between the two marks lies in the final syllable "RI" of Applicant's mark. This, however, is of minor import as a distinguishing element. The Board has frequently found likelihood of confusion from use of marks on related products which were essentially the same but for the presence of a suffix, *e.g.*, *Sun Electric Corp. v. Sun Oil Company of Pennsylvania*, 196 USPQ 450 (TTAB 1977) (SUNELECT and SUN ELECTRIC) and *In re BASF A.G.*, 189 USPQ 424 (TTAB 1975) (LUTEX and LUTEXAL). Here, by contrast, the parties' goods are *identical*, which further exacerbates the likelihood of confusion already present by virtue of the visual similarity between the marks.

Marks with "small suffix" add-on differences comparable to "MAYA" and "MAYARI" have frequently been found to produce a likelihood of confusion or mistake, even when used on merely "similar" goods. *See United States Olympic Comm. v. Olymp-Herrenwaschefabriken Bezner GmbH & Co.*, 224 USPQ 497, 498 (TTAB 1984) (OLYMP and OLYMPIC); *In re Pellerin Milnor Corp.*, 221 USPQ 558 (TTAB 1983) (MILLTRON and MILLTRONICS). In this regard, the addition of the –RI suffix should not overcome the overwhelming similarity in appearance of "MAYA" and "MAYARI" for identical goods.

The Board's conclusion that the marks are not sufficiently similar seems to lie in stark contrast to the decisions set out above, where the same could be said

regarding the "unitary" nature of the marks; e.g., according to the Board's logic, purchasers should perceive no separation between LUTEX- and –AL in LUTEXAL, or between MILLTRON- and –ICS in MILLTRONICS, but there was clear likely confusion found in each case. The established case authority undermines the notion that the Board should reject a claim for likelihood of confusion in part because it finds (without factual support) that there is no reason for consumers to perceive separation.

### c. Standard Characters Increase Similarity

The Board's Decision (at p. 8) acknowledges that Applicant seeks registration of its mark in standard characters, and therefore its presentation is not limited to any particular font, size, style or color. (A008) *See* 37 C.F.R. § 2.52(a); Trademark Manual of Examining Procedure ("TMEP") § 1207.01(c)(iii) ("If a mark (in either an application or a registration) is presented in standard characters, the owner of the mark is not limited to any particular depiction of the mark."). Similarly, Oakville's MAYA mark is registered as a typed drawing (*see* Reg. No. 2,508,401 (A028)), and therefore its presentation is likewise unlimited as to font, size, style or color. *See, e.g.*, *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 950 (Fed. Cir. 2000) ("Registrations with typed drawings are not limited to any particular rendition of the mark and, in particular, are not limited to the mark as it is used in commerce.").

When a word is registered in standard character format, the Board must consider all manners of display that could be represented, including the same stylized lettering as that in which a registrant's mark appears. *In re White Rock Distilleries, Inc.*, 92 USPQ2d 1282, 1284 (TTAB 2009). *See also Phillips Petroleum Co. v. C. J. Webb, Inc.*, 442 F.2d 1376, 1378 (CCPA 1971); *In re Data Packaging Corp.*, 453 F.2d 1300, 1302 (CCPA 1972) ("It seems to be well

established that a single registration of a word mark may cover all of its different appearances, potential as well as actual").

When both marks are in typed or standard character form, there is no legal difference in the stylization of the marks. *Squirtco v. Tomy Corp.*, 697 F.2d 1038, 1041 (Fed. Cir. 1983). The following table sets forth the parties' marks in various stylizations, and highlights for the Court the increased visual identity in the appearance of the marks that can legally occur given Applicant's right to use the MAYARI mark in any format upon registration.

**Table 1: Permissible Presentations of the Parties' Marks in Standard Character Form**

| Oakville's MAYA | Applicant's MAYARI |
|-----------------|--------------------|
| MAYA            | MAYARI             |
| Maya            | mayari             |
| *Maya*          | *Mayari*           |

Thus, to allow Applicant's registration of MAYARI in standard character form enables Applicant to present its mark in a manner virtually identical to that of Oakville's MAYA given the identical first four letters of the marks. The resulting confusion would thereby effectively be sanctioned under federal law, in view of Applicant's registration. Surely such a result, which repeated over time essentially eviscerates the rights of trademark owners and registrants, is not in line with the policy and spirit of the Lanham Act, which seeks to prevent confusion among consumers. Registration of Applicant's mark in standard character form should therefore be refused.

17

### 2. Similarities In Sound

Applicant submitted evidence of pronunciation for the word MAYA from online dictionary definitions. *See* 11 TTABVUE, Applicant's Notice of Reliance No. 3, Exh. 1-3, pp. 5-15 (A074-A085). None of the definitions or other evidence in the proceeding ever presented the word MAYA having a long "a" vowel sound. *See Id.* However, without any evidentiary support, the Board "consider[ed] the possibility that the first syllable of MAYA may be pronounced to rhyme with 'hay' or 'weigh,'" and "consider[ed] the possibility that MAYARI might be pronounced with the emphasis on its second or third syllables, and that the –YAR– syllable might be salient." Decision at p. 9 (A009). There is no support for this conclusion in the factual record.

The Board acknowledged Oakville's arguments that "the marks only differ by two letters that can be easily obscured when spoken" and that "there is an increased likelihood of confusion based on the similarity in sound of the marks as the small difference of the letters "RI" will not differentiate the marks where the goods are ordered by name in a bar under noisy, chaotic conditions." *See, e.g.*, *Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc*., 64 USPQ2d 1039, 1044 (SDNY 2002) (noting "…the often chaotic conditions under which alcoholic beverages are purchased in bars").

Stating that the parties offered no evidence regarding the pronunciation of MAYARI, the Board found the marks are "only possibly similar, in part, in their pronunciation." Decision at p. 17 (A017). However, to say that the parties offered no evidence on pronunciation is not true, as Applicant submitted an excerpt from its website indicating that "With Mayari we honor our daughters Arianna and **Maya**." (17 TTABVUE, Applicant's Notice of Reliance No. 11, Exh. 2, p. 11 (A103)) (emphasis added). Presumably, as a derivation of the name MAYA, it would be reasonable to assume that MAYARI would be pronounced more like the

18

name MAYA, from which it derives, than any differing alternative pronunciation created by the Board.

Instead, the Board engages in speculation as to pronunciation of the marks that is not supported by the record. The Court addressed this issue last year in *Stoncor Group, Inc. v. Specialty Coatings, Inc*., 759 F.3d 1327, 1331-1332 (Fed. Cir. 2014). When Opposer presented evidence that its STONCOR mark would be pronounced as "/STONE-core/" (long – "O" sound), the Board disagreed and found that it would be pronounced with a short –"O" sound under the "ordinary rules of English" – but this Court reversed on the basis that:

> There is no correct pronunciation of a trademark that is not a recognized word. *See In re Belgrade Shoe Co.*, 411 F.2d 1352, 1353 (CCPA 1969). "STON" is not a word in English. Neither party argues that "STON" is a word in any other language. Where a trademark is not a recognized word and the weight of the evidence suggests that potential consumers would pronounce the mark in a particular way, it is error for the Board to ignore this evidence entirely and supply its own pronunciation.

*Stoncor*, 759 F.3d at 1331-1332.

It is an established proposition that there is no "correct" pronunciation of a mark because it is impossible to predict how the public will pronounce a particular mark. Therefore, "correct" pronunciation cannot be relied upon to avoid a likelihood of confusion. *In re Viterra Inc.*, 671 F.3d at 1367 (Fed. Cir. 2012). *See also*, *e.g.*, *Kabushiki Kaisha Hattori Tokeiten v. Scuotto*, 228 USPQ 461 (TTAB 1985) (SEYCOS and design for watches held likely to be confused with SEIKO for watches and clocks); *In re Great Lakes Canning, Inc.*, 227 USPQ 483 (TTAB 1985) (CAYNA (stylized) for soft drinks held likely to be confused with CANA for, *inter alia*, canned and frozen fruit and vegetable juices); *In re Energy*

*Telecommunications & Electrical Association*, 222 USPQ 350 (TTAB 1983) (ENTELEC and design for association services in the telecommunication and energy industries held likely to be confused with INTELECT for conducting expositions for the electrical industry); *In re Cresco Mfg. Co.*, 138 USPQ 401 (TTAB 1963) (CRESCO and design for leather jackets held likely to be confused with KRESSCO for hosiery).

In this case, the Board found that there was no evidence to suggest how potential consumers would pronounce the MAYARI mark, while finding that Opposer's mark is probably pronounced as "mah-yuh" or " 'ma:ya:," (Decision at p. 9 (A009)) and ignored evidence that MAYARI derives from MAYA (*see* 17 TTABVUE, Applicant's Notice of Reliance No. 11, Exh. 2, p. 11 (A103) (excerpt from Applicant's website indicating that "With Mayari we honor our daughters Arianna and Maya")) and thus would be pronounced the same, i.e., "mah-yuh-ri" or " 'ma:ya-ri" .

Thus, the Board improperly interjected its own differing pronunciations for MAYARI (without supporting evidence) by which it purported to establish potentially "correct" *alternative* pronunciations of MAYARI which differ with known pronunciations for MAYA, in order to find a lack of similarity in sound and consequent lack of likelihood of confusion. This goes against a long line of precedent. In sum, to the extent that Applicant has itself supplied evidence that its mark MAYARI derives from "Maya," and since there is no contrary evidence offered regarding pronunciation, and there is no "correct" pronunciation of MAYARI, the Board cannot in the absence of substantial evidence rule that the marks are pronounced differently.

### 3. Similarities In Meaning

#### a. The Board's Conclusion That MAYARI Lacks Meaning Is Unsupported

The Board erred in concluding that there is no evidence of meaning of the mark MAYARI, ignoring substantial evidence that there is identity of meaning ascribed by the parties themselves as between the marks MAYA and MAYARI. *See, e.g.,* 17 TTABVUE, Applicant's Notice of Reliance No. 11, Exh. 2, p. 11 (excerpt from Applicant's website which states: "With Mayari we honor our daughters Arianna and Maya") (A103).

As set out in the record, Oakville's evidence shows that MAYA is well known as a given name for females (9 TTABVUE, Opposer's Notice of Reliance, Exh. 3, p. 19 (A050)), while Applicant's own Notice of Reliance includes evidence that MAYARI is a combination of the female given names Maya and Arianna. 17 TTABVUE, Applicant's Notice of Reliance No. 11, Exh. 2, p. 11 (A103). Thus, both marks represent the given name MAYA, or a derivative thereof.

The Board also dismissed out of hand unrefuted substantial evidence that both marks represent the names of female goddesses. 9 TTABVUE, Opposer's Notice of Reliance No. 1, Exh. 2-8, pp. 12-37 (A042-A069). It is against this backdrop that the Board finds, without substantial evidentiary support, that the parties provided no meaning for MAYARI, when in fact the evidence demonstrates that the marks share similar connotations as being based on the same female given name and both reflecting the name of a goddess.

#### b. The Board's Reliance On Dissimilarity Of Meaning Is Improper

Assuming for the moment, *arguendo*, that the Board was correct regarding facts establishing a lack of meaning for MAYARI, it should be noted that to count as a factor pointing away from confusion, the different meanings of the conflicting words must be understood among those in the target buyer class.

In the case of *TBC Corp. v. Holsa, Inc.*, 126 F.3d 1470 (Fed. Cir. 1997), the Board held that there would be no likelihood of confusion between the opposer's mark GRAND AM for vehicle tires and applicant's mark GRAND SLAM for vehicle tires, because the two designations had very different meanings. However, the Federal Circuit reversed, Judge Rich stating that confusion was likely because of the very similar aural and visual impact, *which was not offset by the different meanings of the terms*. The distinct meaning of the sporting term GRAND SLAM compared to GRAND AM, was found not significant because: "[m]any tire buyers will not be familiar with those definitions, so those uses in the fields of bridge and sports will have no effect on their minds in seeing the term on tires." *TBC Corp.*, 126 F.3d at 1472.

In the instant matter, MAYA is arbitrary in relation to the goods (wine) (*see, e.g.*, 34 TTABVUE, Opposer's Trial Brief at p. 19 (A239)) and the Board stated that "Applicant's dictionary definitions indicate that MAYARI has no meaning." Decision, p. 10 (A010). The Board considered MAYARI to essentially act as a "coinage without meaning" in relation to the relevant consuming public. *See* Decision, p. 12 (A012). Thus, the marks at issue are neither descriptive nor suggestive of any quality or characteristic of wine such that consumers would have any immediate understanding of their meaning.

In an earlier case related to Oakville's mark, the Board found MAYA for wine to be confusingly similar to MAIA for wine. *See Oakville Hills Cellar, Inc. v. Victor F. Maya*, 2008 TTAB LEXIS 570, Opposition No. 91163751 (TTAB 2008) (not precedential). In such case, evidence was presented as to the goddess references of both "Maya" and "Maia." However, in assessing similarity in meaning the Board noted "both MAYA and MAIA are arbitrary for wine and, accordingly, it is unlikely that consumers will appreciate any difference in connotations or commercial impressions of the parties' respective marks." *Id.* at

22

*21. Thus the Board found that "given the substantial similarity in the appearance of both marks and identity in sound between the two, and because both Oakville's mark MAYA and applicant's mark MAIA are arbitrary in relation to wine, we find the marks substantially similar in connotation and overall commercial impression." *Id.* at *20.

Thus, in this case, while the evidence demonstrates that the marks have similar meaning, the marks are also arbitrary, such that any meaning of the marks will be lost on consumers given the similarity in appearance and sound. Thus, as in *TBC Corp.*, the Court should reverse the Board's finding as unsupported based on the *du Pont* prong of meaning of the mark.

### 4. Similarities In Commercial Impression

In taking into account the similarities between the marks as to visual appearance, sound and meaning, the evidentiary facts and law suggest that the parties' marks share a highly similar commercial impression: the marks share the identical initial four letters, the registered mark MAYA is entirely subsumed within the mark MAYARI, and both marks can be presented in identical size, font, style, color, etc. There is no evidence that the marks are pronounced differently, indeed it would seem that they are likely to be pronounced similarly given that MAYARI derives from MAYA. The marks share identical meanings to the extent that Applicant derived the mark from its principal's daughter's name, MAYA (the same derivation as Oakville's MAYA) and given the common reference to mythological deities, but in any event, this factor does not outweigh the similarities in sight and sound. In weighing the factors of similarity in the context of all of the *du Pont* factors, the corresponding commercial impression of the marks is virtually the same as a matter of law.

23

### a. Conditions For Purchase Are Ripe For Confusion

Compounding the similarity in commercial impression, it has been established that the parties sell identical goods via the same channels of trade, to the very same class of consumers under the same conditions. Decision, pp. 5-7, 17 (A005, A007, A017).

Given that the wines at issue are presumed to move through all channels of trade, including bars, there is an increased likelihood of confusion based on the similarity in sound of the marks, as the small difference of the letters "RI" will not differentiate the marks where the goods are ordered by name in a bar under noisy, chaotic conditions. *See Guinness United Distillers & Vintners B.V.*, 64 USPQ2d at 1044 (noting "…the often chaotic conditions under which alcoholic beverages are purchased in bars").

Furthermore, it has been recognized that the selection and purchase of wine and other alcoholic products can take place by consumers after they have imbibed such products or other alcohol, and that imbibing consumers may have even less ability than the general consuming public at large to make distinctions between or among such similar marks, further inhibiting any potential claimed discrimination by consumers. *See, e.g.*, *Gabriel Meffre v. Maria y Adelina S.A.*, Opposition No. 91164878 (June 1, 2007) (not precedential) (SAURUS likely to cause confusion with the registered mark LAURUS for wine). Accordingly, the conditions under which sales of wine are made have been characterized as "ripe" to create consumer confusion given a strong similarity between marks. *Id. See also Duca di Salaparuta S.p.A v. Corvus Cellars LLC*, Opposition No. 91191848 (June 26, 2012) (not precedential) (finding CORVUS & Design for wines, likely to be confused with the registered mark CORVO for wine, noting that wine is a widely available consumer item, that consumers of wine may be unsophisticated, and that the potential for confusion is high).

24

Here, the record contains evidence and it must further be presumed based on the identical goods descriptions that both parties' respective products under the subject marks are sold in the same channels to the same consumers, under such conditions as outlined above, which are ripe to create confusion. (*See, e.g.*, 15 TTABVUE, Applicant's Notice of Reliance No. 9, Exh. 1, pp. 9-10 (A097-098), as well as 17 TTABVUE, Applicant's Notice of Reliance No. 11, Exh. 2, p. 12 (A104)).

### 5. Opposer Is Entitled To The Benefit of the Doubt

It is well settled as an axiom of trademark law that on the statutory issue involved here, doubts are to be resolved against the newcomer and in favor of the prior user. *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 684 (CCPA 1977). If any doubt could exist as to the likelihood of confusion in the present case, it should be resolved in Oakville's behalf because of its prior registered rights and substantial goodwill associated with its marks for such an extended period of time, and because Applicant, as the subsequent user and relatively recent entrant in the field, was obligated to select a mark that would readily be distinguished from and would not infringe upon the established marks of Oakville. *See Winn's Stores, Incorporated v. Hi-Lo, Inc.*, 203 USPQ 140 (TTAB 1979); *H. Sichel Sohne, GmbH v. John Gross & Co.*, 204 USPQ 257 (TTAB 1979); *Key Chemicals, Inc. v. Kelite Chemicals Corp.*, 464 F.2d 1040 (CCPA 1972); *Jiffy Inc. v. Jordan Industries, Inc.*, 481 F.2d 1323 (CCPA 1973).

In light of those considerations, and the identical goods claimed, although the marks involved are not identical, any minor differences between them are insufficient to outweigh the remaining factors that favor refusal of the registration in this case. *See In re Viterra Inc.*, 671 F.3d at 1367.

25

## C. POLICY UNDERLYING THE BOARD'S DECISION

### 1. The Board's Decision Diminishes Trademark Rights And Value

It should be noted that the Board's decision, while not precedential, nevertheless serves to artificially circumscribe the rights of trademark owners generally, and particularly those of U.S. trademark registrants. If this decision is allowed to stand, anyone can hypothetically take a pre-existing arbitrary registered mark and append an obscure suffix arguably having no meaning to the end of such registered mark and thereby obtain registration in standard character form for identical goods. Such party may then proceed to use such similar registered marks in any font, type, style, and color – even if such stylized use is identical to the earlier registered mark – and thereby enjoy the legal presumptions, including those of ownership and validity of the later mark, attendant to federal registration. This effectively eviscerates the advantages of registration for all, and effects a devaluation of federal trademark registration across the board. Finally, and perhaps most importantly, allowing registration of such similar standard character marks for identical goods works to promote consumer confusion as to the source of goods, which goes directly against the spirit and policy of the Lanham Act.

## V. CONCLUSION

It has long been well settled, that similarity in *any one* of the elements of sound, appearance or meaning is sufficient to indicate likelihood of confusion. *See In re Mack*, 197 USPQ 755, 757 (TTAB 1977); *Cecile Gagnon Company v. Bourjois, Inc.*, 223 F.2d 731, 733 (CCPA 1955); *Masterpiece of Pennsylvania Inc., v. Consolidated Novelty Co.,* 368 F.Supp. 550, 552 (SDNY 1973); *In re Oil Well Company*, 181 USPQ 656, 657 (TTAB 1973); *Firestone Tire & Rubber Co. v. Montgomery Ward & Co., Inc.*, 150 F.2d 439 (CCPA 1945); *Krim-Ko Corp. v. Coca-Cola Co.*, 390 F.2d 728 (CCPA 1968); *Humble Oil & Refining Company v.*

*Allied Chemical Corporation*, 165 USPQ 280 (TTAB 1970); and *In re Chesebrough-Pond's Inc.*, 161 USPQ 310 (TTAB 1969). In this case, we have all three. The Board simply chose to ignore such similarities, and erred by supplying its own interpretation of visual, phonetic and semantic non-similarity which was not in the record and did not previously exist, despite a long line of prior precedents to the contrary of this Court and the Board itself.

Opposer Oakville therefore respectfully requests that the Court reverse the Board's incorrect decision, and deny registration of Applicant's proposed mark MAYARI based on the likelihood of confusion with Oakville's Reg. No. 2,508,401 under the Trademark Act, Section 2(d).

Date: December 18, 2015

Respectfully submitted,

DICKENSON, PEATMAN & FOGARTY

By: /s/ J. Scott Gerien
    J. Scott Gerien

1455 First Street, Ste. 301
Napa, California 94558
Telephone: (707) 252-7122
Facsimile: (707) 255-6876
Email: tmltg@dpf-law.com

Attorneys for Appellant, Oakville Hills
Cellar, Inc., dba Dalla Valle Vineyards

27

This Opinion is not a
Precedent of the TTAB

Mailed: July 16, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

*Oakville Hills Cellar, Inc.,*
*dba Dalla Valle Vineyards*

*v.*

*Georgallis Holdings, LLC*

Opposition No. 91211612

J. Scott Gerien and Christopher J. Passarelli of Dickenson Peatman & Fogarty,
   for Oakville Hills Cellar, Inc.

Gregory Scott Smith of GSS Law Group,
   for Georgallis Holdings, LLC.

Before Bucher, Mermelstein and Masiello,
   Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Georgallis Holdings, LLC ("Applicant") filed an application to register the mark

MAYARI in standard characters for "Wine," in International Class 33.[1]

---

[1] Application Serial No. 85735694, filed on September 21, 2012, under Trademark Act
§ 1(a), 15 U.S.C. § 1051(a), stating August 2010 as the date of first use anywhere and first
use in commerce. The application contains the statement, "The wording 'MAYARI' has no
meaning in a foreign language."

Oakville Hills Cellar, Inc. ("Opposer"), doing business as Dalla Valle Vineyards,
opposed registration of the mark on the ground that the mark, as used in connection
with the identified goods, so resembles Opposer's registered mark MAYA as to be
likely to cause confusion, mistake or deception, under Section 2(d) of the Trademark
Act, 15 U.S.C. § 1052(d). Opposer pleaded ownership of Registration No. 2508401
for the mark MAYA in typed form for "Wine," in International Class 33.[2] Applicant,
in its answer, denied the salient allegations of the notice of opposition. The case has
been fully briefed.

I.    The record.

The record includes the pleadings and, by operation of Trademark Rule 2.122,
37 C.F.R. § 2.122, the application file for the opposed mark.

Opposer's pleaded registration was made of record under a notice of reliance, in
the form of a current printout of information from the electronic database records of
the USPTO showing current status and title of the registration.[3] Opposer also filed
a notice of reliance (9 TTABVUE) and a rebuttal notice of reliance (33 TTABVUE)
on the following evidence:

> Evidence relating to the meanings of MAYA and MAYARI from the following
> sources:
>
> > Walker, Barbara G., *The Woman's Encyclopedia of Myths
> > and Secrets* (HarperSanFrancisco 1983).

---

[2] Reg. No. 2508401 issued November 20, 2001. Section 8 affidavit accepted; Section 15
affidavit acknowledged; renewed. Prior to November 2, 2003, "standard character"
drawings were known as "typed" drawings. A typed mark is the legal equivalent of a
standard character mark. *See* TMEP § 807.03(i) (2015).

[3] 9 TTABVUE 9-10. Applicant also made the pleaded registration of record. 32 TTABVUE
72-80.

2

<lowchensaustralia.com/names/Philippines.htm>

<read-legends-and-myths.com/mayari-myths.html>

<urbananito.wikispaces.com/Deities>

Philippines Mythology and Folklore,
at https://sites.google.com/site/philmyths/lesson-2

Press notices from <u>Wine Spectator</u> magazine and Wine Spectator
Online.

Opposer's web page from <dallavallevineyards.com>.

Excerpts of James Halliday, *Wine Atlas of California* (Viking 1993).

Applicant filed 16 notices of reliance on the following evidence:

Information from the Social Security Administration regarding the popularity
rankings of baby names (10 TTABVUE).

Information regarding third-party U.S. trademark registrations and
applications (22-25 and 29-32 TTABVUE).

Online dictionary searches for MAYA and MAYARI (11 TTABVUE).

Online offerings of wines, including those of Applicant and Opposer (12-13
TTABVUE).

Opposer's written responses to document requests, interrogatories, and
requests for admission (14-16 TTABVUE).

Excerpts from websites of Applicant and Opposer (17 TTABVUE).

Federal regulations relating to the labelling, advertising, and marketing of
wine (26-28 TTABVUE).

A stipulation, with attached documents, made of record in a prior opposition
proceeding brought by Opposer against a third party (21 TTABVUE).

3

Information regarding awards won by Applicant's wines under the marks MAYARI and KISSOS (18 TTABVUE).

Information from the USPTO database regarding the marks of Applicant and Opposer (19 TTABVUE).

Public records relating to Applicant's adoption of the fictitious names KISSOS and KISSOS WINE (20 TTABVUE).

II.     Standing.

Opposer has properly made of record its pleaded registration and has thus established its standing to oppose registration of Applicant's mark. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); and *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

III.     Opposer's claim under Section 2(d).

Opposer brings its opposition under Trademark Act § 2(d) on the ground of likelihood of confusion. In view of Opposer's ownership of a valid and subsisting registration of its pleaded mark, priority is not in issue with respect to the mark and the goods identified in the registration. *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Our determination of likelihood of confusion is based on an analysis of all probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

A.    The goods.

Turning first to the similarity or dissimilarity of the goods at issue, we find that they are identical, being identified as "wine" in both the application and the pleaded registration. Although there is evidence of differences in the specific nature of the wines of Applicant and Opposer and of a substantial difference in price, we do not consider those facts in comparing the parties' goods. In the context of an opposition proceeding, the question of registrability of an applicant's mark must be decided on the basis of the identifications of goods set forth in the application and registration at issue. *See Octocom Syst. Inc. v. Houston Computers Svcs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Kalart Co., Inc. v. Camera-Mart, Inc.*, 119 USPQ 139 (CCPA 1958); *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981). Applicant has requested a registration applicable to all kinds of wine in all price ranges; and Opposer's registration covers use of its mark on all kinds of wine. Accordingly, the *du Pont* factor regarding the similarity or dissimilarity of the goods weighs in favor of a finding of likelihood of confusion.

B.    Channels of trade.

We next consider the parties' established and likely to continue channels of trade. Because the parties' goods are identical, we must presume that they move through the same channels of trade and are sold to the same classes of purchasers. *See In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute,* 101 USPQ2d 1022, 1028 (TTAB 2011); *In re Smith and Mehaffey,* 31

USPQ2d 1531, 1532 (TTAB 1994). As there are no limitations as to channels of
trade in the identifications of goods in the registration and application, we presume
that the parties' goods move in all channels of trade that are normal for such goods.
*See Octocom,* 16 USPQ2d at 1787; *Paula Payne Products Co. v. Johnson Publishing
Co.,* 473 F.2d 901, 177 USPQ 76 (CCPA 1973); *In re Linkvest S.A.,* 24 USPQ2d 1716,
1716 (TTAB 1992). Accordingly, the *du Pont* factor of trade channels weighs in favor
of a finding of likelihood of confusion.

C. Buyers.

Applicant argues that "[t]he sophistication of wine consumers clearly mitigates
against a likelihood of confusion in this case," and that "any likelihood of confusion
is further decreased by the expensive nature of Opposer's products."[4] The evidence
indicates that Opposer's goods may cost between \$175 and \$365 per bottle; and that
Applicant's wine has been offered at \$25.[5] However, we must consider purchasers of
wine at all price levels, because the application and registration state no limits as to
the price of the parties' respective goods.

Opposer argues that ordinary purchasers of wine have "little sophistication" and
suggests that they are "impulse buyers" who "would not necessarily be likely to
exercise [a] high degree of care."[6] We assume that the goods include inexpensive
wines that are offered to all normal classes of customers for inexpensive wine. *In re
Elbaum*, 211 USPQ at 640. Such customers include persons of no special

---

[4] Applicant's brief at 19, 35 TTABVUE 25.

[5] Applicant's notice of reliance No. 6, 12 TTABVUE; and Opposer's answer to interrogatory No. 17, 15 TTABVUE 11.

[6] Opposer's brief at 7, 34 TTABVUE 12.

sophistication who would apply only an ordinary degree of care in selecting the goods. This *du Pont* factor favors a finding of likelihood of confusion.

### D.    The marks at issue.

We next consider the similarity or dissimilarity of the marks at issue, in their entireties, in terms of appearance, sound, meaning, and overall commercial impression. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005). In doing so, we bear in mind that "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012). Moreover, the marks 'must be considered … in light of the fallibility of memory …'" *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014), quoting *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 196 USPQ 1 (CCPA 1977). The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *Winnebago Industries, Inc. v. Oliver & Winston, Inc.,* 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.,* 190 USPQ 106, 108 (TTAB 1975). In comparing the marks, we are mindful that "[w]hen marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed.

7

Cir. 1992); *Jansen Enterprises Inc. v. Rind,* 85 USPQ2d 1104, 1108 (TTAB 2007); *Schering-Plough HealthCare Products Inc. v. Ing-Jing Huang,* 84 USPQ2d 1323, 1325 (TTAB 2007).

The marks at issue are MAYA and MAYARI. In appearance, they resemble each other in that they share the initial four letters MAYA, which constitute the entirety of Opposer's mark. Opposer argues that "[i]t is often the first part of a mark which is likely to be impressed upon the mind of a purchaser and remembered," quoting *Presto Products Inc. v. Nice-Pak Products Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988); and refers to MAYA- as "a dominant ... root" of the mark.[7] While there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, *In re National Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985), in the present case we see no reason to perceive any separation, visual or otherwise, between the MAYA- and -RI portions of Applicant's mark. The letters RI, alone, have no relevant meaning, providing no reason for a customer to view the mark logically as MAYA *plus* RI, rather than as a single unitary expression.

We bear in mind that Applicant seeks registration of its mark in standard characters, and therefore it is not limited to any particular font, size, style or color. *See In re Viterra Inc.,* 101 USPQ2d at 1909; *Citigroup Inc. v. Capital City Bank Group, Inc.,* 637 F.3d 1344, 98 USPQ2d 1253, 1259 (Fed. Cir. 2011). Opposer points out that "the bottle label will inevitably appear to read 'MAYA' at certain

[7] Opposer's brief at 8, 10, 34 TTABVUE 13, 15.

orientations relative to an observer,"[8] suggesting that the vagaries of product placement on a shelf may conspire to obscure a part of Applicant's mark from the customer. While this is a type of "mistake" encompassed within the statutory language of Section 2(d), the *likelihood* of such a mistake remains a matter of speculation, absent evidence regarding the occurrence or regularity of mistakes of this sort.

In sound, we note Opposer's statement that it "does not intend that the MAYA mark be pronounced in any particular manner."[9] Dictionary definitions of MAYA indicate that the word is pronounced with the emphasis on the first syllable, as "**mah**-y*uh*" or " 'maːyaː."[10] We also consider the possibility that the first syllable may be pronounced to rhyme with "hay" or "weigh." There is nothing in the record to indicate how MAYARI would be pronounced. To the extent that both marks include the letters MAYA, they could be pronounced the same; however, we consider the possibility that MAYARI might be pronounced with the emphasis on its second or third syllables, and that the –YAR- syllable might be salient.

Opposer, while acknowledging that "it is impossible to predict how the public may pronounce a particular mark," urges:

> [T]he marks only differ by two letters that can be easily obscured when spoken ...
>
> Furthermore, given that the wines at issue must be presumed to move through all channels of trade, including bars, there is an increased likelihood of confusion based

---

[8] *Id.* at 11, 34 TTABVUE 16.

[9] Opposer's response to interrogatory No. 25, 15 TTABVUE 15.

[10] Applicant's notice of reliance No. 3, 11 TTABVUE 6-7, 13.

> on the similarity in sound of the marks as the small
> difference of the letters "RI" will not differentiate the
> marks where the goods are ordered by name in a bar
> under noisy, chaotic conditions.[11]

The parties have vigorously contested the meaning or connotation of the marks.
Applicant's dictionary definitions indicate that MAYARI has no meaning, and that
MAYA has several salient meanings, primarily (a) the Hindu concept of "the power,
as of a god, to produce illusions" (or the name of a goddess embodying this power);
(b) the pre-Columbian civilization of the Yucatan Peninsula; and (c) a member of a
modern American Indian people of southern Mexico, Guatemala, and parts of
Honduras.[12]

Opposer contends that MAYA is a "given name for girls" having its origins in the
name of a Hindu goddess.[13] Opposer further contends that MAYARI is "a Filipino
lunar goddess" and a given female name.[14] Both names appear on "baby name"
websites, MAYA noted as being of "Latin" origin and MAYARI noted as being of
"Filipino" origin.[15] MAYARI also appears on an Internet list of "Filipino Names"
under the rubric of "Gods, Goddesses and Deities of the Philippines,"[16] and on
certain websites that discuss Tagalog myths.[17] Opposer contends that since both
marks may signify given female names and goddesses, "the marks must be found to

---

[11] Opposer's brief at 12, 34 TTABVUE 17.

[12] Applicant's notice of reliance No. 3, 11 TTABVUE.

[13] Opposer's brief at 12-13, 34 TTAVUE 17-18.

[14] *Id*. 34 TTABVUE 18.

[15] Opposer's first notice of reliance, 9 TTABVUE 19-23.

[16] *Id*., 9 TTABVUE 25-26.

[17] *Id*., 9 TTABVUE 29-38.

be similar in connotation."[18] Applicant refers to Opposer's attempt to connect MAYA with Hindu mythology and MAYARI with Filipino mythology as "tenuous" and "without any support or evidence that consumers would make such a tenuous connection."[19] Referring to searches of a "Popular Baby Names" website of the Social Security Administration, Applicant argues that in each year between 2000 and 2013, MAYA has ranked between 113th and 57th in popularity; while MAYARI has not appeared among the top 1000 most popular names in any of the last 100 years.[20] Applicant also argues that any meaning that MAYA may have is lost in Applicant's mark MAYARI.

> Although the letters MAYA are contained in Applicant's
> MAYARI mark, MAYA is so merged or integrated into the
> MAYARI mark that it "loses its individual identity
> therein." *See Castle & Cooke, Inc. v. Oulevay, S.A.*, 152
> USPQ 115 (CCPA 1967) … As a result, consumers will not
> view MAYA as having a separate meaning apart from the
> MAYARI mark as a whole. … [T]he meaning of MAYA is
> completely lost when the additional letters 'RI' are added
> …[21]

Considering all of the foregoing, we note that the marks are visually similar only in part; no evidence shows that they would be pronounced alike, and they may well be pronounced quite differently. With respect to meaning, we are not persuaded that customers would be aware of the more esoteric meanings of the marks; rather, we find that most customers would likely perceive MAYA as a female personal

---

[18] Opposer's brief at 13, 34 TTABVUE 18.

[19] Applicant's brief at 10, 35 TTABVUE 16.

[20] Applicant's first notice of reliance, 10 TTABVUE 6-8.

[21] Applicant's brief at 9-10, 35 TTABVUE 15-16.

11

name or the name of the pre-Columbian civilization, while most customers would perceive MAYARI as a coinage without meaning. In this regard, customers would likely find the term MAYA to be somewhat familiar, while finding MAYARI unfamiliar. *See Jacobs v. International Multifoods Corporation*, 668 F.2d 1234, 212 USPQ 641, 642 (CCPA 1982) ("the familiar is readily distinguishable from the unfamiliar"). Overall, we find that the marks create significantly different commercial impressions. Accordingly, the *du Pont* factor of the similarity or dissimilarity of the marks weighs against a finding of likelihood of confusion.

### E.    The fame of Opposer's mark.

Opposer maintains that its mark is famous, having been "featured time and again in premiere wine industry publications, including Wine Spectator, and hav[ing] received critical acclaim over a sustained period of time from at least 1995."[22] For purposes of a claim of likelihood of confusion, fame arises if a "significant portion of the relevant consuming public … recognizes the mark as a source indicator." *Palm Bay Imports Inc.,* 73 USPQ2d at 1694. If it exists, fame plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection. Accordingly, it is the duty of the party asserting that its mark is famous to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007).

---

[22] Opposer's brief at 14, 34 TTABVUE 19.

The relevant portions of the record, consisting primarily of excerpts from <u>Wine Spectator</u> magazine,[23] are too scant to support a finding that Opposer's mark is famous. <u>Wine Spectator</u> is a specialty publication that regularly gives notice to dozens of brands of wines. Although the accolades accorded to Opposer's brand in this publication are a meaningful form of evidence, such evidence does not alone suffice to demonstrate public recognition of Opposer's mark among "a significant portion" of the relevant public, namely, purchasers of wine. We find that Opposer has not demonstrated fame for purposes of a likelihood of confusion analysis. We treat the *du Pont* factor of fame as neutral.

## F.    Federal labelling requirements.

Applicant points out that federal labelling requirements applicable to wine require that a wine label include "the name and address of the bottler or packer of the wine, the place where the wine was bottled or packed (e.g., 'Bottled by Dalla Valle Vineyards Oakville California USA'), and the class, type, or other designation (which can be satisfied by including an appellation of origin (e.g., 'Napa Valley')," citing 27 CFR Part 4 and 13.[24] Applicant argues that this information, included on both parties' labels, will assist in distinguishing the parties' goods from each other. Generally, other matter that is currently required by government regulations to appear on a product label will not reliably serve to distinguish confusingly similar trademarks from each other. As the Board stated in *In re Merck & Co., Inc.*, 189 USPQ 355, 356 (TTAB 1976):

---

[23] Opposer's first notice of reliance, 9 TTABVUE 40-88.

[24] Applicant's brief at 14-15, 35 TTABVUE 20-21.

13

> [T]he regulations of the Federal Food and Drug Agency
> are of no significance on the question here before the
> Board. … [T]he issue under consideration in this appeal is
> whether the applicant may be permitted to register its
> mark in view of a prior registration of an allegedly
> confusingly similar mark. The presence of other matter on
> the label of the particular product here involved can have
> no bearing on the decision as to said marks.

*Id.* Moreover, Applicant's argument does not apply to uses of the parties'
trademarks otherwise than on labels. We treat this factor as neutral.

G.    Similar marks in use.

In accordance with *du Pont*, we consider any evidence of record regarding "the
number and nature of similar marks in use on similar goods." *Du Pont*, 177 USPQ
at 567. Applicant has shown that the marks MAYACAMAS and TAMAYA are in
use on wines, and that both marks have appeared on commercial websites together
with Opposer's MAYA wine.[25] However, we agree with Opposer that the marks
TAMAYA and MAYACAMAS are substantially different in commercial impression
from Opposer's mark and do not demonstrate that Opposer's mark is weak.[26]
Applicant has also shown that the mark GRAND MAYAN is in use for tequila;
however, we find this fact to be of minimal relevance to the strength of Opposer's
mark.

Applicant has submitted third-party registrations and applications for
registration of MAYA-formative marks relating to beverages, both alcoholic and

---

[25] Applicant's notice of reliance No. 7, 13 TTABVUE.

[26] Opposer has submitted evidence to show that MAYACAMAS refers to a mountain range
in California's wine country. (Opposer's second notice of reliance, 33 TTABVUE.)

non-alcoholic, and mostly for beverages other than wine.[27] For purposes of demonstrating the weakness of a mark, we give little weight to third-party registrations because they are not evidence that the marks are in use. *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.*, 98 USPQ2d 1921, 1934 (TTAB 2011). We find the *du Pont* factor of similar marks in use on similar goods to be neutral.

      H.    Absence of actual confusion.

Opposer has admitted that it is not aware of any instances of actual consumer or trade confusion involving the parties' marks.[28] However, on the present record it is not clear that there has been a meaningful opportunity for confusion to occur. There is little evidence of the actual extent of marketing and promotion of the parties' marks. Although both parties' goods have enjoyed some level of success and have won awards (in different venues), the extreme difference in the prices of the parties' respective goods ($25 versus $200-$300 per bottle) indicates that these marks may currently occupy different commercial spheres, such that they have not necessarily crossed paths in an environment where confusion could occur. Under the circumstances, we find the lack of evidence of actual confusion to be a neutral factor in our analysis. *Cf. Citigroup Inc. v. Capital City Bank Group, Inc.,* 94 USPQ2d 1645, 1660 (TTAB 2010), *aff'd,* 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011)

---

[27] Applicant's notices of reliance Nos. 4 and 5, 22-25 TTABVUE.

[28] Opposer's responses to interrogatory No. 26, 15 TTABVUE 16; and request for admissions No. 2, 16 TTABVUE 6.

15

(Board found lack of confusion probative where parties operated numerous branch banks nearby each other).

I.    Right to exclude others from use.

Opposer argues that the eleventh *du Pont* factor, "the extent to which [Opposer] has a right to exclude others from use of its mark on its goods," weighs in Opposer's favor. In support of this argument, Opposer refers only to the fact that its mark is registered and is entitled to the effect of Section 33 of the Trademark Act, 15 U.S.C. § 1115. Subsection (b) of that section provides that an incontestable registration is "conclusive evidence … of the registrant's exclusive right to use the registered mark in commerce." However, the Act provides that "Such conclusive evidence of the right to use the registered mark shall be subject to proof of infringement …" 15 U.S.C. § 1115(b). Our review of this case gives full regard to the evidentiary significance of Opposer's registration under the Trademark Act. However, absent further evidence of the extent of Opposer's rights and an explanation as to how the extent of its rights increases the likelihood of confusion, Opposer's registration alone does not serve as an additional factor weighing in Opposer's favor in a *du Pont* analysis. Accordingly, we consider this factor to be neutral.

J.    Extent of potential confusion.

Under the rubric of the extent of potential confusion (the 12th *du Pont* factor), Opposer describes a number of scenarios in which confusion between the marks could occur. The 12th *du Pont* factor is intended to address whether the potential for confusion is "de minimis or substantial." *Du Pont*, 177 USPQ at 567. Opposer does

16

not address that specific issue in its argument or in its evidentiary submissions. We find this factor to be neutral.

IV.    Conclusion.

We have considered all of the evidence of record relevant to the *du Pont* factors and all arguments of the parties, including those not specifically discussed herein. The parties' goods are identical and would travel through the same channels to the same classes of customers, some of whom would exercise no more than an ordinary degree of care in selecting the goods. However, the marks are visually similar only in part; are only possibly similar, in part, in their pronunciation; and would likely be perceived to have different meanings and overall commercial impressions. On this record, we find that the marks are sufficiently different that, under normal commercial conditions for the sale of wines, confusion is not likely.

***Decision:*** The opposition is dismissed.

**THIS OPINION IS NOT A PRECEDENT OF THE TTAB**

Mailed:
June 1, 2007
Bucher

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

Gabriel Meffre[1]

v.

María y Adelina S.A.

_____

Opposition No. 91164878
against Serial No. 78303363

_____

Brooks R. Bruneau of Mathews Shepherd McKay & Bruneau for
    Gabriel Meffre.

María y Adelina S.A., *pro se*.[2]
_____

Before Hohein, Bucher and Taylor, Administrative Trademark
    Judges.

Opinion by Bucher, Administrative Trademark Judge:

    María y Adelina S.A., a corporation of Argentina, seeks

registration on the Principal Register of the mark **SAURUS**

*(in standard character format)* for goods identified in the

application, as amended, as "wines, distilled spirits,

---

[1]    Formerly Etablissements Gabriel Meffre Societe des Grands
Vins de Gigondas.
[2]    A patent agent, Henri Misrahi, of Aventura, FL is listed as
applicant's domestic representative and U.S. correspondent, while
most of applicant's electronic submissions filed with the United
States Patent and Trademark Office were executed by an authorized
corporate representative, Roberto Schroeder.

cordials, liqueurs, aperitifs with a wine base" in

International Class 33.[3]

Gabriel Meffre has opposed the application on the

ground of priority of use and likelihood of confusion,

alleging that applicant's mark, when used in connection with

the identified goods, so resembles opposer's previously used

mark, **LAURUS** *(also in standard character format)* registered on

the Principal Register by opposer for goods identified as

"alcoholic beverages, namely wines" in International Class

33,[4] as to be likely to cause confusion, to cause mistake or

to deceive under Section 2(d) of the Lanham Act.

Applicant, in its answer, has denied the salient

allegations in the opposition.

By operation of the rules, the record includes the

pleadings and the file of the opposed application. Opposer,

as part of its case-in-chief, has made of record its pleaded

registration by submitting a certified status and title copy

of the registration showing that it is subsisting and is

---

[3]     Application Serial No. 78303363 was filed on September 22,
2003 based upon applicant's allegation of a *bona fide* intention to
use the mark in commerce.  No allegation of use has been filed.
[4]     Registration No. 2341092 issued to Etablissements Gabriel
Meffre Societe des Grands Vins de Gigondas, a corporation of
France, on April 11, 2000, based upon an application filed on May
14, 1999, containing allegations of first use anywhere at least as
early as September 28, 1994 and first use in commerce at least as
early as April 1998.  Section 8 affidavit (six-year) accepted and
Section 15 affidavit acknowledged.  Several subsequent name
changes have been duly recorded with the Assignment Division of
the United States Patent and Trademark Office.

owned by opposer. Opposer, also as part of its case-in-chief, has made of record the testimonial deposition (along with attached exhibits) of Mr. Thomas Lambert-Laurent, Executive Vice President for Vranken America, opposer's exclusive distributor in the United States, and a subsidiary of Vranken Pommery Monopole (France); and the testimonial deposition (along with accompanying exhibits) of Mr. Anthony Yarborough, Vice President of Robert Jackson & Associates, a private investigation firm. Opposer, in addition, has filed a brief on the case. Applicant, however, submitted no evidence in this proceeding and did not file a brief.

Opposer is a French wine company that produces and sells a variety of wines, many of which are sold in the United States. There are twenty different varieties of opposer's **LAURUS** brand of wines sold in the U.S. by Vranken America. Each bottle bears the **LAURUS** mark as do the cases holding the bottles of wine. Vranken America, opposer's exclusive U.S. distributor of **LAURUS** brand wines, sells that product through wholesalers and directly to retailers, restaurants, hotels and other individual accounts. Distributors and wholesalers who receive **LAURUS** wine from Vranken America in turn sell it to the retail market, such as wine or liquor stores, restaurants or hotels.

**LAURUS** wines are advertised nationally, regionally and locally in the United States.  Advertisements made of record include ones appearing in national magazines like *Wine Spectator*, and national newspapers such as *The New York Times*.  Depending upon the varietal of wine, opposer's **LAURUS** brand wines are offered at the retail level at a broad spectrum of price points, ranging from twelve to sixty dollars a bottle.

Opposer's standing is a threshold inquiry made by the Board in every *inter partes* case.  In *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999), the Court of Appeals for the Federal Circuit enunciated a liberal threshold for determining standing, i.e., whether one's belief that one will be damaged by the registration is reasonable and reflects a real interest in the case.  *See also Jewelers Vigilance Committee Inc. v. Ullenberg Corp.*, 823 F.2d 490, 2 USPQ2d 2021, 2023 (Fed. Cir. 1987); and *Lipton Industries, Inc. v. Ralston Purina Company*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).  We find that opposer has established its standing in view of its demonstrated ownership of its subsisting **LAURUS** registration.

With regard to the issue of priority in relation to the goods set forth in opposer's pleaded registration, because opposer has established that it owns a valid and subsisting

registration of its pleaded mark, the issue of priority does
not arise. *See King Candy Company v. Eunice King's Kitchen,
Inc*., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974); and *Carl
Karcher Enterprises Inc. v. Stars Restaurants Corp*.,
35 USPQ2d 1125 (TTAB 1995).

We turn, then, to the issue of likelihood of confusion
under Section 2(d) of the Trademark Act. Specifically, the
focus of our determination is on the issue of whether
applicant's **SAURUS** mark, when used in connection with wines,
distilled spirits, cordials, liqueurs, and aperitifs with a
wine base, so resembles opposer's **LAURUS** mark as to be
likely to cause confusion, to cause mistake or to deceive as
to source or sponsorship.

Our determination of likelihood of confusion must be
based upon our analysis of all of the probative facts in
evidence that are relevant to the factors bearing on the
issue of likelihood of confusion. *See In re E. I. du Pont
de Nemours & Co*., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).
*See also In re Majestic Distilling Company, Inc*., 315 F.3d
1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In considering the
evidence of record on these factors, we keep in mind that
"[t]he fundamental inquiry mandated by Section 2(d) goes to
the cumulative effect of differences in the essential
characteristics of the goods and differences in the marks."

- *5* -

*See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d
1098, 192 USPQ 24 (CCPA 1976). *See also In re Dixie
Restaurants Inc.*, 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir.
1997).

Turning first to the goods, applicant seeks to register
and use its mark in connection with wine – the precise goods
listed in the cited registration. The other alcoholic
beverages that applicant lists, including drinks having a
wine base, are closely related to opposer's wine.

We turn next to several related *du Pont* factors, such
as channels of trade and conditions of sale. Inasmuch as
there are no limitations as to the channels of trade in
either applicant's application or in opposer's registration,
we must assume that the parties' alcoholic beverages would
be sold in the same channels of trade and to the same
classes of consumers. *See Canadian Imperial Bank of
Commerce v. Wells Fargo Bank, NA*, 811 F.2d 1490, 1 USPQ2d
1813 (Fed. Cir. 1987) [the question of likelihood of
confusion must be determined based on an analysis of the
mark as applied to the goods recited in applicant's
application vis-à-vis the goods  recited in an opposer's
registration]; *see also*, *Pennwalt Corp. v. Center Lab.,
Inc., 187 USPQ 599,* 601 (TTAB 1975); and *Sterling Drug Inc.
v. Merritt Corp.,* 119 USPQ 444, 445 (TTAB 1958).

As to the conditions under which the goods are sold to consumers, opposer makes the interesting argument that imbibing consumers may have even less ability than the general consuming public at large to make distinctions between or among such similar marks:

> Finally, Gabriel Meffre wishes to point out to the Board that sales of its LAURUS wines do take place at restaurants and hotels…. Accordingly, selection and purchase of wine and other alcoholic products can take place by consumers after they have imbibed such products or other alcohol, further inhibiting any potential claimed discrimination by consumers. Accordingly, the conditions under which sales are made are in fact ripe to create consumer confusion given the strong similarity between the marks.

Opposer's brief, p. 19.

We are in agreement that these factors related to the relationship of the goods – the channels of trade and conditions of sale – also favor the position taken by opposer.

We turn next to examine the similarity or dissimilarity of the parties' marks in their entireties as to appearance, sound, connotation and commercial impression (*See Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005)), bearing in mind that "[w]hen marks would appear on virtually identical goods or services, the degree of similarity [of the marks] necessary to support a conclusion of likely

- 7 -

confusion declines." *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 1034 (1994).

In this context, opposer argues that the parties' marks are confusingly similar as to appearance, sound and meaning.

As to appearance, both marks are six letters long, and there is only one letter difference between the two marks. We find that the striking, overall similarities are much more critical than is the difference between the first letters. And of course, the test is not whether applicant's mark can be distinguished from opposer's mark when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar that confusion as to the source of the goods offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975).

As to the strong similarity in sound, opposer argues that this is a case where the similarity in sound alone is sufficient to find a likelihood of confusion. *Molenaar, Inc. v. Happy Toys, Inc.,* 188 USPQ 469 (TTAB 1975); and *In Re Cresco Manufacturing Co., Inc.,* 138 USPQ 401 (TTAB 1963).

We agree that when sounded out in their entireties, there is great similarity in the sound of the respective marks. The fact that the leading letter will inevitably result in a perceptible aural difference is simply not enough for us to find that the marks are sufficiently dissimilar in sound to overcome a likelihood of confusion.

Opposer argues that the term "LAURUS" has absolutely no meaning in relation to the goods other than the strong source identifying significance this arbitrary designation has achieved in this field.[5] Applicant argued in its answer that "saurus" comes from Latin and "refers to animals of the family of dinosaur…."[6] In spite of applicant's arguments to the contrary, we find on this record that **SAURUS** is an arbitrary term without any meaning. Accordingly, as to connotation and commercial impression, both marks represent arbitrary terms as applied to wines and other alcoholic beverages.

---

[5]   Applicant argued in its answer that "[i]n [L]atin, 'Laurus' means 'Triumph,' whereas in English, 'Laurus' refers to a plant." Of course, this has not been shown as applicant presented no supportive evidence of this meaning during the testimony period.
[6]   Again, this has not been shown, as applicant presented no supportive evidence of this meaning during the testimony period. Furthermore, opposer points out that WEBSTER'S NEW WORLD DICTIONARY (Third college ed.) does identify "-saurus" as a suffix drawn from the Latin word for "lizards" and "used to form the scientific means of certain genera of reptiles." However, used alone, it is not an English-language word, and opposer argues that there is no demonstration that this suffix alone would be recognized by consumers as suggesting dinosaurs.

Hence, we find that in spite of the difference in leading letters, the two marks are highly similar as to appearance, sound, connotation and commercial impression.

As to the *du Pont* factor focusing on the length of time during and conditions under which there has been contemporaneous usage without evidence of actual confusion, inasmuch as **SAURUS** is an intent-to-use application and the record contains no proof that applicant has ever used this mark in the U.S. on wines, or in connection with any other alcoholic beverage, we find that there have been no opportunities for consumer confusion to have occurred.  This factor is therefore neutral.

In conclusion, we find that the goods herein are identical and otherwise closely related, that the channels of trade and potential customers are presumed to be substantially the same, if not identical, and that the marks are confusingly similar as to appearance, sound, connotation and commercial impression.  Hence, we find that there is a likelihood of confusion.

*Decision*:  The opposition based upon Section 2(d) of the Lanham Act is hereby sustained, and registration to applicant is refused.

> **THIS OPINION**
> **IS NOT A PRECEDENT**
> **OF THE TTAB**

Mailed:  August 26, 2008

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

Oakville Hills Cellar, Inc.
v.
Victor F. Maya

_____

Opposition No. 91163751
to application Serial No. 78364405
filed on February 7, 2004

_____

J. Scott Gerien of Dickenson, Peatman & Fogarty for Oakville
Hills Cellar, Inc.

Victor F. Maya, *pro se*.

_____

Before Grendel, Zervas and Taylor, Administrative Trademark
Judges.

Opinion by Taylor, Administrative Trademark Judge:

Victor Maya has filed an application to register on the

Principal Register the mark MAIA (in standard character

form) for "wine." in Class 33.[1]

_____

[1]  Serial No. 78364405, filed on February 7, 2004, and asserting
January 1, 1998 as the date of first use of the mark anywhere and
January 1, 2004 as the date of first use of the mark in commerce.

Registration has been opposed by Oakville Hills Cellar.
Opposer, in its amended notice of opposition, specifically
alleges, *inter alia*, that "since as early as 1990, well
before any filing date or date of first use upon which
Applicant can rely, Opposer adopted and continuously used
the mark MAYA in connection with wine" (Opposition ¶ 1);
that it "is the owner of Registration No. 2,508,401[2] for the
mark MAYA [in "typed" form[3]] for wine in International Class
33, goods similar to those identified in Applicant's
application" (Opposition ¶ 2); and that applicant's mark so
resembles its previously used and registered mark MAYA, as
to be likely, when applied to the goods of applicant, to
cause confusion, or to cause mistake, or to deceive.[4]

Opposer also alleges that "based on Applicant's failure
to use the mark MAIA in commerce, Applicant is not entitled
to registration of its mark pursuant to Section 1(a) as
alleged in Applicant's application, and application Serial
No. 78/364,405 should therefore be denied." (Opposition ¶
10).

---

[2]  Registration 2508401 issued November 20, 2001, Section 8
Affidavit accepted, Section 15 Affidavit acknowledged.

[3]  The former reference to what the Office now refers to as
"standard character" form.

[4]  Opposer also claimed ownership of Registration No. 2274626 for
the mark MAYA and design.  However, that registration has been
cancelled under Trademark Act § 8 for opposer's failure to file
an affidavit of continued use.  Opposer's claim in view of this
registration is therefore moot.

Case: 16-1103   Document: 11   Page: 65   Filed: 12/18/2015

Opposition No. 91163751

Applicant, in its answer, admits that opposer is the
owner of Registration No. 2508401, but has denied the
remaining essential allegations of the notice of
opposition.[5]

## *THE RECORD*

The record includes the pleadings and the file of
involved application Serial No. 78364405. During their
testimony periods, both opposer and applicant filed notices
of reliance; opposer filing one during its testimony period
and one during its rebuttal testimony period and applicant
filing five during his testimony period. Although only
applicant has raised a number of objections to opposer's
evidence, we find that a discussion of the evidence,
submitted by both opposer and applicant during their

---

[5]   Applicant also pleaded certain affirmative defenses, which are
in the nature of elaborations of his denials and have been
considered only to that extent. In addition, "in order to avoid
the inconvenience of trial and for the benefit of all parties
involved," applicant offered to (1) restrict his use of the MAIA
mark to not include the wine grapes Cabernet Sauvignon and
Cabernet Franc and (2) to amend the basis of his application if
the Board determines that he did not declare the correct basis.
Inasmuch as trial has been completed, we will not consider these
proffered amendments. Notably, acceptance of the amendment to
the identification of goods would not have changed our decision
herein on opposer's Section 2(d) claim.

We also note that applicant, in its brief, requested the Board
to "intervene to mediate a reasonable, mutually agreeable, and
legally sound compromise settlement that will bring this matter
to its final conclusion." (Brief at p. 28) Such a request in a
final brief is both untimely and inappropriate.

3

respective testimony periods, is necessary because much of
the material sought to be introduced is not admissible via
notice of reliance.[6]  We also note that applicant, prior to
briefing in this case, moved to strike opposer's notice of
reliance filed January 8, 2008.

## Applicant's Motion to Strike

We first address applicant's motion to strike opposer's
notice of reliance, filed January 8, 2008 during opposer's
scheduled rebuttal testimony period.  Applicant argues that
the documents accompanied by the notice of reliance are
improper rebuttal because applicant took no testimony, and
that the notice of reliance is procedurally defective.  On
March 25, 2008, the Board denied the motion insofar as it is
based on a procedural defect, finding that opposer
sufficiently explained the relevance of the attached
material.  We now consider whether the documents
accompanying the notice constitute improper rebuttal.
Opposer responded to the motion, arguing that the content of
the rebuttal notice of reliance directly addressed evidence
submitted by applicant during his testimony period.

A party may, on rebuttal, introduce facts and witnesses
to deny, explain or discredit facts and witnesses adduced by

---

[6]  Further, the evidence attached to opposer's brief is untimely
and has not been considered herein.  See Trademark Manual of
Procedure ("TBMP") § 704.05(b)(2d ed. rev. 2004)(and the cases
cited therein).

the defendant.  See Carefirst of Maryland Inc. v.

FirstHealth of the Carolina Inc., 77 USPQ2d 1492, 1498 (TTAB

2005).  Opposer's notice of reliance introduces excerpts

from the book Wine Atlas of California by James Halliday,

published in the United States in 1993 by the Penguin Group,

Penguin Books USA Inc.  Opposer indicates in the notice that

the excerpts would be relied upon to rebut the assertion in

"Item One" of applicant's notice of reliance[7], filed

November 23, 2007, regarding the similarity of the marks

MAYA and MAYACAMUS for wine, and to demonstrate that the

---

[7]  Item One [Exhibit 1] consists of a copy of opposer's
supplemental responses to applicant's second set of
interrogatories, nos. 1 and 4.  Applicant indicates that the
responses are relied upon, in part, to demonstrate that Opposer
does not consider the trademark Mayacamus for wine to be
confusing or harmful to the use of its MAYA mark.

Interrogatory 1:

> Does Opposer consider the registered trademark
> MAYACAMUS, Registration No. 1050905, for wine, to
> be harmful to the commercial use of the mark
> MAYA, for wine, or in any way confusingly similar
> to consumers while distinguishing between the
> two.

Supplemental Response:

> Opposer objects to this interrogatory on the
> grounds that it seeks information which is
> neither relevant nor likely to lead to the
> discovery of admissible evidence.  Subject to and
> without waiving this objection, Opposer states
> that Opposer lacks sufficient information to
> fully evaluate the potential for harm or consumer
> confusion between the referenced marks; however,
> Opposer can state that to date it is unaware of
> any instances of consumer confusion between them.

term "Mayacamus" describes and refers to a well documented
wine-growing region of California.

Applicant appears to be under the misapprehension that
opposer may only rebut evidence in the form of testimony.
That is not the case. Evidence in support or defense of
claims in a Board proceeding may be made of record by
several means, including a notice of reliance. See
generally, TBMP Chapter 700 (2d ed. rev. 2004). We find
that the evidence attached to opposer's rebuttal notice of
reliance as to the geographical meaning of the term
"Mayacamus" in relation to wine explains opposer's position
with regard to the MAYACAMUS trademark, introduced by
applicant in his November 23, 2007 notice of reliance.

Accordingly, applicant's motion to strike is denied.

**Notices of Reliance**

In a Board proceeding, certain materials may be made of
record pursuant to a notice of reliance. However, the
categories of materials which may be introduced under a
notice of reliance are limited. They consist only of an
adverse party's discovery deposition, answer to an
interrogatory or admission to a request for admission[8];
printed publications[9]; and official records. [10]   Within this
framework, we consider the evidence of record.

---

[8]   See Trademark Rule 2.120(j)(3)(i).
[9]   See Trademark Rule 2.122(e).
[10]   *Id.*

6

Opposer's Notices of Reliance

1.   Opposer's notice of reliance, filed November 13,
2007, on (1) portions of the discovery deposition transcript
of applicant [Exhibit 1]; (2) a copy prepared and issued by
the Patent and Trademark Office showing current status and
title of pleaded Registration No. 2508401 [Exhibit 2]; (3)
an excerpt from The Women's Encyclopedia of Myths and
Secrets [Exhibit 3]; (4) definitions and pronunciation keys
for the terms "maya" and "maia" [Exhibits 4 and 5]; (5) web
pages from two websites [Exhibits 6 and 7]; and (6) copies
of articles from Wine Spectator magazine [Exhibits 8 through
15].

2.   Opposer's rebuttal notice of reliance, filed
January 8, 2008, on excerpts from the Wine Atlas of
California.

Applicant's Notices of Reliance

1.   Applicant's notice of reliance, filed November 5,
2007, on (1) excerpts from the Oxford English Dictionary
[Exhibit 1]; (2) copies of web pages from various websites,
including Wikipedia [Exhibits 2, 3, 5, 7, 10, and 11]; (3)
an unreferenced copy of a John Keats poem [Exhibit 4]; (4)
opposer's responses to applicant's first set of
interrogatories nos. 8 and 9 and fourth set of
interrogatories nos. 11, 12, 13 and 14 [Exhibits 6 and 8];
(5) a printout from the Trademark Electronic Search System

7

(TESS) of Registration No. 1050905 [Exhibit 9]; (6)
opposer's responses to applicant's first request for
admissions no. 9 [Exhibit 12]; and (7) opposer's
supplemental responses to applicant's first request for
admissions nos. 2 and 3 and fourth set of interrogatories
no. 11 [Exhibit 13].

    2.   Applicant's notice of reliance, filed November 13,
2007, on (1) copies of newspaper and periodical articles
about MAYA wine [Exhibits 1, 3 and 4]; and (2) a copy of a
letter from applicant to opposer [Exhibit 2].

    3.   Applicant's notice of reliance, filed November 15,
2007, on (1) a copy of the annual report to the State of
North Carolina for Maia, LLC [Exhibit 1]; (2) copies of a
Watershed Protection Permit and a zoning permit issued by
Burke County, North Carolina [Exhibits 2 and 3]; (3) copies
of wine labels for MAIA wine [Exhibit 4]; (4) copies of
packing lists for farm equipment, labeling supplies and
storage supplies [Exhibit Nos. 5, 8 and 10]; (5) copies of
invoices for bottling supplies and plant tissue [Exhibit
Nos. 6 and 7]; and (c) a copy of a purchase contract for
nursery supplies [Exhibit 9].

    4.   Applicant's notice of reliance, filed November 26,
2007, on (1) opposer's supplemental responses to applicant's
second set of interrogatories 1 and 4 [Exhibit 1]; and (2) a
printout from the website for the Theoi Project [Exhibit 2].

5.  Applicant's notice of reliance (also filed November 26, 2007) on documents marked confidential, namely, (1) opposer's responses to applicant's first set of interrogatories nos. 2, 3, 4, 6 and 7 [Exhibit 1]; and (2) opposer's response to applicant's first request for production of documents, nos. 1, 2, 3 and 10 [Exhibit 2].

Trademark Rule 2.122(e)[11] allows for the submission of "printed publications" or "official records" by a notice of reliance because they are self-authenticating, may be submitted by notice of reliance.  We therefore find as follows:

(1)  The Internet excerpts consisting primarily of web pages from various websites submitted by both parties are not self-authenticating in nature and, thus, are not admissible by notice of reliance.  Raccioppi v. Apogee Inc., 47 USPQ 1368, 1370 (TTAB 1998).  Accordingly, Exhibits 6 and 7 of opposer's notice of reliance, filed November 13, 2007, as well as Exhibits 2, 3, 5, 7, 10 and 11 of applicant's notice of reliance, filed November 5, 2007, are not properly

---

[11]  Trademark Rule 2.122(e) provides, in part, as follows:

> Printed publications and official records.
> Printed publications, such as books and
> periodicals, available to the general public in
> libraries or of general circulation among members
> of the public or that segment of the public which
> is relevant under an issue in a proceeding, and
> official records, if the publication or official
> record is competent evidence and relevant to an
> issue, may be introduced in evidence by filing a
> notice of reliance on the material being offered.

of record and therefore have not been considered in this
decision.

(2)   Copies of applicant's wine labels, packing slips,
invoices and a purchasing contract are not self-
authenticating printed publications or official records and
may not be made of record by notice of reliance.
Accordingly, Exhibits 4 through 9 of applicant's notice of
reliance, filed November 15, 2007, are not properly of
record and therefore have not been considered in this
decision.

(3)   The unreferenced copy of the Keats poem is neither
a printed publication nor an official record and accordingly
may not be made of record by notice of reliance.
Accordingly, Exhibit 4 of applicant's November 5, 2007
notice of reliance is not properly of record and therefore
has not been considered.

Last, we consider applicant's evidentiary objections.
We need not, however, consider the objections to those
documents which we have found to be not properly of record
because they cannot be submitted via notice of reliance.
Accordingly, we will not further consider applicant's
objections to Exhibits Nos. 6 and 7 of opposer's notice of
reliance.[12]   Hence, the only remaining objection is to

_____

[12] In addition, applicant's objection to opposer's rebuttal
notice of reliance on the ground that it is improper

10

exhibit 3 of applicant's notice of reliance, i.e., the
excerpt from the Women's Encyclopedia of Myths and Secrets,
on the grounds of "incompetence and/or hearsay." These
objections are overruled. Although, a printed publication
is usually only admissible for what it shows on its face,
the excerpt falls within an exception to the hearsay rule.
That is, the Board may properly take judicial notice, for
the truth of the matter stated therein, of information
appearing in standard reference works, such as encyclopedias
and treatises. *See e.g.*, In re Hartop & Brandes, 311 F.2d
249, 135 USPQ 419, 420 n.6 (CCPA 1962). We find that
opposer, by its notice of reliance, is essentially
requesting the Board to take judicial notice of the factual
information contained in the excerpts from the Women's
Encyclopedia of Myths and Secrets, and we have taken
judicial notice and have considered the excerpt for its
appropriate probative value.

     With respect to the material, as outlined above, that
we have not considered in this decision, we note that even
if we had considered those submissions, they would not have
changed our outcome with respect to opposer's claims.

---

rebuttal and immaterial is moot, inasmuch as we addressed
the issue in our decision on applicant's motion to strike.

## *DISCUSSION*

### Opposer's Standing and Priority of Use

We now consider the merits of opposer's Section 2(d) claim.  Inasmuch as opposer has properly made its pleaded registration of record, we find that opposer has established its standing to oppose registration of applicant's mark. See Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); and Lipton Industries, Inc. v Ralston Purina Co., 670 F.2d 1024, 213 USPQ 105 (CCPA 1982). Moreover, because opposer's pleaded registration for the MAYA mark is of record, Section 2(d) priority is not an issue in this case as to the goods identified therein.  *See* King Candy Co. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

### Likelihood of Confusion

Our determination of the issue of likelihood of confusion is based on an analysis of all the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  In considering the evidence of record on these factors, we keep in mind that "[t]he fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."  Federated Foods, Inc. v.

12

Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976).

We first consider the *du Pont* factors which pertain to the similarity or dissimilarity of the goods, channels of trade and classes of purchasers. It is well settled that likelihood of confusion is determined on the basis of the goods as identified in the application and in the pleaded registration. Hewlett-Packard Co. v. Packard Press, Inc., 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002). Herein, the goods identified in the application are "wine." The goods identified in opposer's pleaded registration are "wine." Thus, the goods are legally identical.

Despite the identity of the goods, applicant attempts to claim that the comparison of the goods should not be based on the respective identifications but rather on the basis of "actual use" of the respective marks on or in relation to wine products." Applicant particularly argues that there is no likelihood of confusion because opposer's mark is used "exclusively" on a wine that is a blend of the red grapes Cabernet Sauvignon and Cabernet Franc and is produced in the Napa Valley of California, whereas its mark is not, and never has been, used in connection with that well known blend or in connection with any grapes from that distinct wine producing region. This argument is unavailing. An applicant may not restrict the scope of the

13

goods covered in the cited registration by argument or
extrinsic evidence. *See* In re Bercut-Vandervoort & Co., 229
USPQ 763, 764 (TTAB 1986).

Applicant similarly attempts to claim that the parties'
respective goods travel in different trade channels and to
different classes of consumers. However, because the
identical identifications of goods in the pleaded
registration and applicant's application are not restricted
as to channels of trade or classes of purchasers, we must
presume that both opposer's wine and applicant's wine will
travel in the same channels of trade and have the same
methods of distribution, including high-end boutiques, wine
shops and grocery stores, and will be offered to the same
consumers, namely ordinary purchasers seeking wine. *See* In
re Elbaum, 211 USPQ 639, 640 (TTAB 1981).

We thus find the *du Pont* factors of the similarity of
the goods, channels of trade and classes of purchasers
strongly favor opposer.

With respect to the conditions under which the parties'
goods will be purchased, applicant contends that given the
sophistication of opposer's customers [due to higher-end
pricing and limited availability of opposer's wine], they
are "fully cognizant of the 'Maya' brand, as distinguished
from any others." (Brief p. 14). As noted above, in the
absence of any limitations in the identification of the

14

pleaded registration, it must be presumed that opposer's
wine will include inexpensive varieties that will be
purchased by ordinary consumers. These ordinary consumers
would be expected to exercise no more than ordinary care
when selecting opposer's wine.

Accordingly, this *du Pont* factor is neutral or, at
best, slightly favors opposer.

We next consider the similarity of the marks, keeping
in mind that when marks would appear on identical goods, as
they do here, the degree of similarity necessary to support
a conclusion of likely confusion declines. *Century 21 Real
Estate Corp. v. Century Life of America*, 970 F.2d 874, 23
USPQ2d 1698, 1700 (Fed. Cir. 1992). In determining the
similarity or dissimilarity of the marks, we must consider
the marks in their entireties in terms of sound, appearance,
meaning and commercial impression. *Palm Bay Imports, Inc.
v. Veuve Clicquot Ponsardin*, 396 F.3d 1369, 73 USPQ2d 1689
(Fed. Cir. 2005). The test is not whether the marks can be
distinguished when subjected to a side-by-side comparison,
but rather whether the marks are sufficiently similar in
their entireties that confusion as to the source of the
goods offered under the respective marks is likely to
result. The focus is on the recollection of the average
purchaser, who normally retains a general, rather than a
specific impression of trademarks. *Sealed Air Corp. v.*

*Scott Paper Co.*, 190 USPQ 106 (TTAB 1975). That is, the
purchaser's fallibility of memory over a period of time must
be kept in mind. *See Grandpa Pidgeon's of Missouri, Inc. v.
Borgsmiller*, 477 F.2d 586, 177 USPQ 573 (CCPA 1973); and
*Spoons Restaurant Inc. v. Morrison Inc.*, 23 USPQ2d 1735
(TTAB 1991), aff'd unpub'd (Fed. Cir., June 5, 1992).

Obviously, the marks differ in appearance. Opposer's
pleaded mark is MAYA and applicant's applied-for mark is
MAIA. However, the difference between the two is not
particularly significant when we consider the overall
similarities. The marks are similarly constructed. Each
mark contains two syllables comprised of four letters –
three in common, and both begin with the letters "MA" and
end with the letter "A." The only difference being them is
that the third letter in opposer's mark is a "Y," while the
third letter in applicant's mark is an "I." It is unlikely
that consumers will focus on this difference because the
different letters are imbedded in the middle of both marks.
Applicant argues that the marks are distinctly different in
appearance because his mark "is in the standard character
mark, which is lower case, wherein the letters 'i' and 'y'
are distinctly different in appearance" and because he "is
not applying for registration of a design at this time."
(Brief at p. 10). As opposer points out, the fact that
applicant seeks registration of his mark in standard

16

character format, as does opposer, means that neither party is limited to any particular manner of display. See Phillips Petroleum Co. v. C. J. Webb, Inc. 442 F.2d 1376, 170 USPQ 35, 36 (CCPA 1971) (When a word mark is registered in typed form, the Board must consider all reasonable modes of display that could be represented.). Thus, both parties could display their marks in similar lettering. In addition, neither party's mark includes a design element. As a result, any design element that opposer may utilize in the marketplace does not limit the scope of its pleaded registered MAYA mark in any way. Quite simply, the difference in the parties' marks is not so significant that it is likely to be noted or remembered by purchasers upon seeing the marks at different times.

In addition, MAYA and MAIA may be pronounced the same. While the marks could be pronounced differently, as applicant urges, it is settled that there is no correct pronunciation of a trademark, as it is impossible to predict how the public will pronounce a particular mark. Kabushiki Kaisha Hattori Tokeiten v. Acuotto, 228 USPQ 461 (TTAB 1985). Thus, even if marks may be pronounced differently, they also may be pronounced in the same manner. Therefore, for our purposes, the parties' marks are phonetically identical.

Further, as regards the connotation and commercial impression of the marks, given the substantial similarity in the appearance of both marks and identity in sound between the two, and the because both opposer's mark MAYA and applicant's mark MAIA are arbitrary in relation to wine, we find the marks substantially similar in connotation and overall commercial impression.

Applicant maintains that the marks have distinctly different meanings and origins as either common nouns or proper nouns. Applicant particularly contends that The Oxford English Dictionary defines the common noun "maia" as "a spider-crab" and the common noun "maya" as "Illusion: a prominent term in Hindu philosophy." (Exhibit 1, Applicant's not. of rel., filed November 5, 2007); and that the proper noun "Maia" has its origin in Greek mythology and identifies the mother of Hermes, one of the seven Pleiades, whereas "Maya" has its origin in India and identifies the mother of Buddha. Opposer, on the other hand, maintains that the terms "maia" and "maya" have an overlap in meaning, notwithstanding their different origins. Both terms, opposer contends, "are religious references to the virgin mothers of well-known spiritual or historical persons, and both MAYA and MAIA were individuals regarded in their respective cultures as goddesses in their own right." (Brief at p. 5). As noted above, and confirmed by the

parties' arguments and evidence, both MAYA and MAIA are
arbitrary for wine and, accordingly, it is unlikely that
consumers will appreciate any difference in connotations or
commercial impressions of the parties' respective marks.

Thus, the *du Pont* factor of similarity of the marks
favors opposer.

The next *du Pont* factor to consider is the strength of
opposer's MAYA mark. Opposer contends that its mark is
arbitrary, and therefore strong and entitled to a wide scope
of protection. Opposer also maintains that its MAYA mark is
well-known among the relevant purchasing public, namely,
consumers of wine. Opposer particularly contends that:

> During Opposer's continuous use of its MAYA
> mark on wine for the past sixteen years,
> the wine has come to be regarded as one of
> California's top red wines, receiving a
> substantial amount of unsolicited media
> attention and public recognition … Most
> recently, Opposer's MAYA wine was named one
> of Napa Valley's Top 50 Cabernets by Wine
> Spectator magazine in 2006, being named the
> seventh best Napa Valley Cabernet for the
> period 1990-2003.

(Brief at p. 12, citing to Exhs. 8-15 of Opposer's not. of
rel., filed November 13, 2007 and Exhs. 1, 3 and 4 of
Applicant's not. of rel., filed November 13, 2007). While
opposer's MAYA wine has been rated by Wine Spectator
magazine as a top California wine for many years, and has
been touted in several publications as a superior wine, the

19

record does not support a finding that opposer's wine is
famous.

Thus, the *du Pont* factor of fame is neutral.

Considering next the number and nature of similar marks
in use on similar goods, applicant has made of record a TESS
copy of a single third-party registration [Registration No.
1050905] for the mark MAYACAMUS for "wine." Applicant
maintains that:

> When the Board considers that a Registered
> Trademark exists that is identical to
> Opposer's Maya mark in every conceivable
> respect, that it holds priority over
> Opposer's mark, and that Opposer never
> opposed it, the Board will conclude that
> Opposer's action against Applicant's Maia
> mark is arbitrary and inexplicable, and the
> Applicant prevails in the sixth test.

(Brief at p. 16). While third-party registrations may be
used to demonstrate that a portion of a mark is suggestive
or descriptive, they are not evidence that the marks shown
therein are in use or that the public is aware of them. See
AMF Incorporated v. American Leisure Products, Inc., 177
USPQ 268, 269 (CCPA 1973)["little weight is to be given such
registrations in evaluating whether there is likelihood of
confusion."]. In any event, the MAYACAMUS mark in the sole
proffered third-party registration is not as similar to
applicant's pleaded mark as is applicant's mark. As our
principal reviewing court noted in Nett Designs, 236 F.3d
1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001), "[e]ven if some

20

prior registrations had some characteristics similar to
[applicant's] application, the PTO's allowance of such prior
registrations does not bind this Board or this court."
Further, to the extent that applicant is arguing that
opposer's failure to oppose registration of the MAYACAMUS
mark entitles it to registration of his mark, we find such
argument unpersuasive. This proceeding involves opposer's
opposition to applicant's registration. Opposer's failure
to oppose a registration of a substantially different mark
is irrelevant.

     This *du Pont* factor thus favors opposer.

     Last, applicant has admitted that he has yet to use the
MAIA mark in commerce in connection with the sale of his
wine.[13] Accordingly, and contrary to applicant's
contention, the *du Pont* factors of the nature and extent of
any actual confusion and the length of time during and
conditions under which there has been concurrent use without
evidence of actual confusion are neutral.

     When all of the relevant *du Pont* factors are
considered, we conclude that contemporaneous use by
applicant of the mark MAIA for wine is likely to cause

---

[13] Applicant stated in his deposition that he has never shipped,
sold or commercially produced wine under the MAIA mark.
(Opposer's not. of rel., Exhibit 1, citing to the Maya deposition
pp. 8-10, 13-15, 21, 24, 33-34, 37 and 39).

confusion with opposer's use of its MAYA mark with respect
to wine.

### *NON-USE OF THE MAIA MARK IN COMMERCE*

We now address the issue of whether applicant is
entitled to registration of its mark pursuant to Section
1(a) of the Trademark Act.  Opposer maintains that applicant
failed to make a bona fide use of his MAIA mark in commerce
prior to the filing of his use-based application for
registration of the MAIA mark under Section 1(a) and, thus,
the opposition should be sustained.

Applicant, on the other hand, "acknowledges that its
[sic] use basis falls in a 'gray area' of interpretation"
and request the Board to consider the entirety of the
circumstances. (Brief, p. 23).  Applicant explains that:

> Federal permitting is required before wine
> can be sold or shipped across state lines.
> Such permitting is not practical until the
> quantity of wine produced is sufficient to
> warrant it.  Consequently, use under these
> circumstances is limited to applying the
> mark to wine labels, maintaining an
> internet website and corresponding domain
> name, conducting business transactions that
> do not involve the sale of alcoholic
> beverages, and transporting wine within the
> state of production for promotional
> purposes.

(Id.)

Pursuant to Section 45 of the Trademark Act, "… a mark
shall be deemed to be in use in commerce on goods when- (A)
it is placed in any manner on the goods or their containers

22

or the displays associated therewith or on the tags or
labels affixed thereto, or if the nature of the goods makes
such placement impracticable, then on documents associated
with the goods of their sale, and (B) the goods are sold or
transported in commerce." 15 U.S.C. § 1127(1). As
indicated previously, applicant, during his August 14, 2006
deposition, admitted that he had yet to sell, ship or
commercially produce any wine under the MAIA mark. (Exh. 1
to opposer's not. of rel., filed November 13, 2007, citing
to the Maya deposition, pp. 14, 24 and 33). We thus find
that, at least as of August 14, 2006, applicant had not used
his MAIA mark in commerce as defined by Section 45. Because
applicant had not used his mark as of the filing date of his
use-based application, applicant was not entitled to seek
registration under Trademark Act Section 1(a).[14]

Decision: The opposition is sustained as to both
opposer's Section 2(d) claim and its claim based on
applicant's failure to make bona fide use of its mark in
commerce prior to his filing for registration of the MAIA
mark under section 1(a).

---

[14] Applicant requested, in the event the Board found that he
misinterpreted the rule regarding use in commerce, that he be
allowed to amend his application basis to Section 1(b). Opposer
indicates that it does not consent to the requested amendment.
We find the request inappropriate at this late stage of the
proceeding. Moreover, inasmuch as we have found the parties'
respective marks confusingly similar, the request is moot.

23

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Mailed:
June 26, 2012

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

Duca di Salaparuta S.p.A

v.

Corvus Cellars LLC

_____

Opposition No. 91191848
to application Serial No. 77652324
filed on January 19, 2009

_____

G. Franklin Rothwell and Anne M. Sterba of Rothwell, Figg,
Ernst & Manbeck P.C. for Duca di Salaparuta S.p.A.

Anthony M. Verna III of Kravitz & Verna LLC for Corvus
Cellars LLC

_____

Before Seeherman, Cataldo and Shaw, Administrative
Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Duca di Salaparuta S.p.A. has opposed the application

of Corvus Cellars LLC to register CORVUS and design, as

shown below, for wine.[1]



The application contains the following description:

> The mark consists of a circle that has a tan 'C'
> on the left hand side of the circle with the 'C'
> opening to the right side.  There is a copper
> background and a black raven that fills the lower
> two thirds of the circle.  In the black area that
> makes up the raven, there is an ivory star, the
> raven's eye in ivory and the word 'CORVUS' in
> ivory.  The colors black, copper, tan, ivory are
> claimed as a feature of the mark.

The opposition has been brought on the ground of

likelihood of confusion, Section 2(d) of the Trademark Act,

15 U.S.C. § 1052(d).[2]  Specifically, opposer has alleged

that since prior to the priority date of applicant's

application opposer has used and advertised the mark CORVO

in the United States for wine; that it owns a registration

---

[1]  Application Serial No. 77652324, filed January 19, 2009,
asserting first use in November 2006 and first use in commerce in
March 2007.

[2]  Opposer initially pleaded the ground of dilution as well,
Section 43(c) of the Trademark Act, but in its trial brief it
withdrew this claim.

for CORVO for wines that was registered in 1950; that its

mark is famous and that it acquired such fame prior to

applicant's use; that November 2006 is the earliest

possible date that applicant can rely on; and that

applicant's mark so resembles opposer's previously used and

registered mark CORVO that its use on wines is likely to

cause confusion or mistake or to deceive.

In its answer applicant has admitted opposer's

ownership of its pleaded registration, No. 532892,

registered on October 31, 1950, for CORVO for wines; that

this registration is valid, subsisting and incontestable;

and that applicant has no connection with opposer.[3]

Applicant has otherwise denied the allegations in the

notice of opposition. Applicant has also made certain

assertions in amplification of its denial that its mark is

likely to cause confusion. One of these assertions is that

opposer "produces, and is known for producing, only

Sicilian wines," ¶ 2, and that opposer "is a large company

with an international presence." ¶ 9.[4]

---

[3] The registration, which was made of record with opposer's
notice of opposition, was issued on October 31, 1950. Section 8
and 15 affidavits have been respectively accepted and
acknowledged, and the registration has been renewed three times.
[4] One of the allegations made by applicant in these "defenses"
is that "CORVO is a descriptive mark for a type of wine (a dry
white or red wine from Sicily)." At the discovery conference
held between the parties, at which a Board interlocutory attorney
participated, the Board attorney explained that an attack on a

3

By operation of the rules, the record includes the pleadings and the file of the opposed application. Opposer has also made of record, by notice of reliance, applicant's responses to one interrogatory; applicant's responses to certain of opposer's requests for admission; Internet printouts; and articles from printed publications. Opposer also submitted by notice of reliance an additional copy of its pleaded registration. Applicant did not submit any evidence. Opposer and applicant filed trial briefs, and opposer filed a reply brief.[5]

Standing

Opposer has made its registration for CORVO for wine of record. In view thereof, opposer has shown a personal stake in this proceeding, and has established its standing. Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

---

pleaded registration can only be made by way of a counterclaim or petition to cancel the registration, and that, because opposer's registration is more than five years old, it could not be cancelled on the ground of mere descriptiveness. The parties agreed that they would not go forward on the affirmative defense and on November 25, 2009 the Board struck the defense of mere descriptiveness.
[5] In opposer's reply brief it makes the statement that applicant's trial brief was untimely and should be stricken. Opposer is advised that a request to strike a brief should be made by separately captioned motion, not included within the body of a brief. Nonetheless, it is noted that the Board accepted applicant's brief in its January 17, 2012 order, and the brief has been considered.

## Likelihood of confusion

There are two elements to a claim of likelihood of confusion under Section 2(d) of the Trademark Act: priority and likelihood of confusion. With respect to priority, applicant has admitted opposer's priority. Response to request for admission 7. In addition, in view of opposer's registration for CORVO for wine, priority is not in issue. King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services. See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). See also, In re Dixie Restaurants Inc., 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997).

Applicant has admitted that the parties' goods are identical, response to request for admission No. 8, and

5

that neither its application nor the opposer's registration
have any limitation in the identifications as to the
channels of trade, response to request for admission No. 9.
The parties' goods are identified in the application as
"wine" and in the registration as "wines." Despite these
admissions and the identical identifications of the goods,
applicant asserts that the goods have a different target
market because of the price points, type of wine
represented and geography of the fruit, and channels of
advertising and sales. Brief, p. 2. We are not persuaded
by this argument. As applicant has admitted, the goods as
identified are identical and the identifications contain no
limitations as to channels of trade. Therefore, the goods
must be treated as legally identical, and we must assume
that the parties' wines can be the same type, made from
fruit from the same geographic locations, sold at the same
price points, be directed to the same classes of
purchasers, and be advertised in the same media and sold
through the same channels of trade. In re Smith and
Mehaffey, 31 USPQ2d 1531, 1532 (TTAB 1994) (because the
goods are legally identical, they must be presumed to
travel in the same channels of trade, and be sold to the
same class of purchasers). The du Pont factors of the

similarity of the goods and the channels of trade favor
opposer.

As for the factor of the conditions of purchase, wine
is purchased by the adult members of the public at large.
They include both those who are knowledgeable about wine,
and those who are not. Moreover, wine can be sold at
various price points, including inexpensive, mass market
wines that may be purchased by undiscriminating purchasers
without great care. See In re Jacob Demmer KG, 219 USPQ
1199, 1201 (TTAB 1983) (one can concede an enormous growth
in recent years of buyer sophistication in wine purchasing
without conclusion that this would obviate likelihood of
confusion or transform all buyers into discriminating
purchasers immune form source confusion). Although
applicant argues that its "$50 wines cannot be considered
an impulse purchase," applicant's identification is not
limited to wines sold at this price point. The du Pont
factor of the conditions of purchase favors opposer.

We next consider the fame or strength of opposer's
mark. Opposer has submitted several hundred articles taken
from both general circulation and trade journals for the
period from 1978 until 2009, in which its CORVO wine is
mentioned. Many of these mentions are casual, for example,
a restaurant review for Ristorante Sergio in the October

7

26, 1984 "Arkansas Democrat-Gazette" says, in the fifth

paragraph, "Corvo, an enjoyable but undistinguished

Sicilian wine, costs $14.50 a fifth. A July 3, 1999

article in "The Houston Chronicle" about how to make

Sicilian pizza includes on the second page the sentences,

"With Sicilian pizza, why not try Sicilian wine? Corvo, a

modern winery located there, makes good red and white wines

that are available in most wine shops and many

supermarkets." A small number of other articles are about

opposer and its CORVO wine, e.g., a May 24, 1995 article in

the "Birmingham News," discusses Corvo winemaker Franco

Giacosa and the history of Corvo wines. Although the

articles show that CORVO wine has received some mention

throughout the years, the evidence falls far short of

establishing that CORVO is a famous mark. Opposer has not

submitted any evidence of its sales or its advertising

expenditures, or any examples of its direct advertising of

CORVO wines, such that we can determine that there have

been extensive sales and advertising, or widespread

recognition of the mark by the consuming public. Because

of the extreme deference accorded to a famous mark in terms

of the wide latitude of legal protection it receives, and

the dominant role fame plays in the likelihood of confusion

analysis, it is the duty of the party asserting fame to

clearly prove it. Lacoste Alligator S.A. v. Maxoly Inc.,
91 USPQ2d 1594, 1597 (TTAB 2009); Leading Jewelers Guild
Inc. v. LJOW Holdings LLC, 82 USPQ2d 1901, 1904 (TTAB
2007). The references in the articles are not sufficient
to show that CORVO is a famous mark for wine. See Hard
Rock Café Licensing Corp. v. Elsea, 48 USPQ2d 1400, 1407
(TTAB 1998) (articles appearing in newspapers and
periodicals throughout the United States in late 80s and
early 90s that are about or include references to Hard Rock
Café restaurants or clothing and other promotional items
not sufficient to prove mark famous).

Although we do not treat opposer's mark as famous, on
this record we must find it to be a strong mark. Based on
this record, CORVO, which means "raven" in Italian, is an
arbitrary mark for wine. There is no evidence of any
third-party use of CORVO marks. Nor is there any evidence
of third-party registrations that would indicate "corvo"
has a significance for wine.[6]

We next turn to a consideration of the marks, keeping
in mind certain principles of law. First, when marks would

---

[6] In its brief, at p. 6, applicant asserts that there are
third-party marks for "very different goods and services" and "a
number of similar marks in [sic] similar and related goods in the
USPTO database." No evidence of such use or registrations has
been made of record, and therefore we give this unsupported
assertion no weight.

appear on virtually identical goods or services, as they do
here, the degree of similarity necessary to support a
conclusion of likely confusion declines.  Century 21 Real
Estate Corp. v. Century Life of America, 970 F.2d 874, 23
USPQ2d 1698, 1700 (Fed. Cir. 1992).  Second, the owner of a
registration in typed or standard character format is
entitled to depictions of the mark regardless of font
style, size, or color.  Citigroup Inc. v. Capital City Bank
Group Inc., 98 USPQ2d 1253, 1259 (Fed. Cir. 2011).  Third,
there is nothing improper in stating that, for rational
reasons, more or less weight has been given to a particular
feature of a mark, provided the ultimate conclusion rests
on a consideration of the marks in their entireties.  In re
National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed.
Cir. 1985).  A particular feature of a mark may be more
obvious or dominant.  Kangol Ltd. v. KangaROOS U.S.A.,
Inc., 974 F.2d 161, 23 USPQ2d 1945, 1946 (Fed. Cir. 1992).

     Again, opposer's mark is CORVO, registered in typed
form, and applicant's mark is shown below:



Because opposer's mark is registered in typed format,
opposer is entitled to use its mark in any format,
including the lower case lettering used by applicant in its
mark.  As for applicant's mark, although it includes a
prominent design element, we view CORVUS as the dominant
element of the mark because it is the only word in the
mark, and therefore the part of the mark that can be
articulated.  As a result, consumers will refer to or call
for the product by the term CORVUS, and this portion will
therefore make a greater impression upon purchasers.  See
In re Appetito Provisions Co., 3 USPQ2d 1553, 1554 (TTAB
1987) (If a mark comprises both a word and a design, then
the word is normally accorded greater weight because it
would be used by purchasers to request the goods or
services).  Thus, the presence of the design element in
applicant's mark is not sufficient to distinguish this mark
from opposer's mark.  Although consumers may note the
design element, they are not likely to regard the design as

11

indicating a separate source for the goods. Likewise, the
stylized letter "C" is integrated into the design and
serves as a border for both the design and the word CORVUS.
It thus is unlikely that consumers would articulate the
letter "C" but rather would view it as part of the design.

We recognize that opposer's mark is CORVO and
applicant's mark is CORVUS. However, the very small
difference in last letter/two letters of the words, like
the design element in applicant's mark, is not sufficient
to distinguish the marks. The four identical letters that
begin the marks make a much greater impact.

Thus, although the marks have some differences in
appearance, when they are compared in their entireties the
similarities outweigh the differences. We are not
persuaded by applicant's argument that in comparing the
marks we should consider the manner in which opposer's mark
is shown in the specimens submitted with its renewal
applications. First, the specimens of use submitted by
opposer in connection with the renewals of its registration
are not of record. Second, opposer's mark is registered as
a typed drawing and therefore, as pointed out above,
opposer is entitled to use the mark in any typestyle.

As for pronunciation, because the marks begin with the
same syllable, and most two-syllable English words are

pronounced with the accent on the first syllable, the marks
are very similar in sound.  With respect to the meaning of
the marks, opposer points to applicant's admissions that
CORVUS refers to a constellation known as "The Crow,"
response No. 5; that "corvo" translates as "raven",
Response No. 6; that a raven is a black bird, response No.
7; and that the design portion of applicant's mark includes
a black bird, response No. 3.  We are not convinced that
most purchasers of opposer's and applicant's products would
be aware that CORVO means raven and CORVUS is the name of
the Crow constellation, let alone that they would make a
connection between raven and crow because each is a black
bird and applicant's mark includes the design of a black
bird, and therefore view both marks as conveying a similar
meaning.  We think it more likely that consumers would
consider CORVO and CORVUS not to have a meaning at all, or
to be made up words having the same "meaning."  However, to
the extent that consumers are aware that CORVO means raven,
the black bird design in applicant's mark would certainly
reinforce this meaning and therefore the connection with
opposer's mark.

        Because of the overall similarity of the marks, we
find that this du Pont factor favors opposer.

Applicant points out that there is no evidence of actual confusion. However, it has often been recognized that such evidence is very difficult to obtain. Lebanon Seaboard Corp. v. R&R Turf Supply Inc., 101 USPQ2d 1826, 1834 (TTAB 2012). Certainly we cannot infer from the lack of such evidence that confusion is not likely, since on this record we have no information as to the extent of either opposer's or applicant's sales or marketing, and therefore whether there has been an opportunity for confusion to occur. Thus, we treat the du Pont factors of evidence of actual confusion and lack of evidence of actual confusion as neutral.

As for the extent of potential confusion, because wine is a widely available consumer item, the extent of potential confusion is high. This factor favors opposer. We treat the remaining du Pont factors, to the extent that they are relevant, as neutral.

In summary, although there are certain differences between the marks, on the whole they convey similar commercial impressions because of the close similarity of the word elements. When this similarity of the marks is coupled with the other du Pont factors that strongly favor opposer, in particular, the legally identical goods and channels of trade, and unsophisticated purchasers, we find

14

that applicant's use of its CORVUS and design mark for wine

is likely to cause confusion with opposer's registered mark

CORVO for wines.

Decision:   The opposition is sustained.

**CERTIFICATE OF SERVICE**

I declare that I am over the age of 18 years, employed in the County of Napa, and not a party to the within action; my business address is 1455 First Street, Ste. 301, Napa, California 94559.

On December 18, 2015, I placed a copy of the following document(s):

- **Brief of Appellant**

in a sealed envelope addressed as shown below and placing the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

The persons served are as follows:

Warren Dranit
Spaulding McCullough &
Tansil LLP
90 South E St., Ste. 200
Santa Rosa, CA 95404

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed December 18, 2015, at Napa, California.

Jaymie Kilgore
Legal Secretary